# United States Court of Federal Claims

No. 10-375 C
**Filed Under Seal: October 22, 2010**
**Reissued: November 5, 2010**[*]

| | |
|---|---|
| **Linc Government Services, LLC,** | Post-Award Bid Protest; 28 U.S.C. § 1491(b); |
| *Plaintiff,* | Negotiated Procurement; Interested Party; |
| | Prejudice; Administrative Procedure Act; |
| **v.** | 5 U.S.C. § 706; Waiver Rule; Patent Ambiguity; |
| | Patent Error; Principles for Interpretation of |
| **United States of America,** | Government Solicitations; Past Performance |
| | Evaluation; Price Evaluation; IDIQ Contract; |
| *Defendant,* and | Discussions; Permanent Injunction; Public |
| | Interest; National Security |
| **McNeil Technologies Inc.,** | |
| *Intervenor.* | |

*John C. Dulske*, *Joan Kelly Fowler Gluys*, The Law Offices of Dulske & Gluys, P.C., San Antonio, TX, for plaintiff.

*William J. Grimaldi*, *Tina Marie Pixler*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

*David S. Cohen*, *John J. O'Brien*, *William J. Bainbridge*, Cohen Mohr, LLP, Washington, DC, for intervenor.

## OPINION and ORDER

**BLOCK,** *Judge*.

In this post-award bid protest, plaintiff, Linc Government Services, LLC ("Linc"), challenges the United States Army's contract award to intervenor, McNeil Technologies, Inc. ("McNeil"). Along with its original pleading, plaintiff filed a motion for a temporary restraining order and preliminary injunction, pursuant to Rule 65(a),(b) of the Rules of the United States Court of Federal Claims ("RCFC"). For their part, defendant and intervenor moved to dismiss the protest for lack of jurisdiction, pursuant to RCFC 12(b)(1). On July 7, 2010, the court held a consolidated proceeding that combined oral argument on these motions with the hearing on the merits. *See* RCFC 65(a)(2). At the conclusion of that proceeding, the court denied plaintiff's motion for preliminary injunctive relief as well as defendant and intervenor's respective motions

---

[*] This opinion originally issued under seal on October 22, 2010. The court afforded the parties an opportunity to propose redactions in the published opinion. Defendant and intervenor proposed the redaction of certain offeror-specific information, while plaintiff proposed extensive redactions targeted largely at eliminating negative information about its own proposal. *See* Appendix A for the court's written response.

to dismiss.  Now before the court are the parties' RCFC 52.1 cross-motions for judgment on the administrative record as well as plaintiff's motion for permanent injunctive relief.

This case involves two topical issues at the core of the United States' continuing mission in Iraq, namely, the ongoing counterinsurgency effort and the evolving role of private contractors.  *See, e.g.*, Michael R. Gordon, *Civilians to Take U.S. Lead After Military Leaves Iraq*, N.Y. Times, August 19, 2010, at A1; Nathan Hodge, *The Iraq Transition: As Combat Mission Ends, a New U.S. Operation Begins*, Wall St. J., September 1, 2010, at A8.  Not incidentally, the case also raises national security concerns, particularly in light of plaintiff's request for injunctive relief and the possible disruptive impact that any injunction would have on military operations in Iraq.

In November 2008, more than five years after the start of the multinational military campaign in Iraq, the United States and Iraq entered into a Status of Forces agreement ("SOFA"),[1] setting the path toward an end to the United States' military presence in that country.  In accordance with the terms of that agreement, American military forces withdrew from Iraqi cities, towns, and villages in the summer of 2009, and, in recognition of Iraqi sovereignty, have since been allowed only restricted entry into these population centers.  *See* SOFA Art. 5, cl. 2.  The United States' military is now preparing for complete withdrawal from Iraq by December 31, 2011.  *See* SOFA Art. 24, cl. 1.

Until such withdrawal, however, American military forces—including, pertinently for the instant protest, the United States Army ("Army")—continue their counterinsurgency ("COIN")[2] operations, in support of the Iraqi government's efforts to achieve lasting stability in that fledgling democratic republic.  *See* SOFA, Art. 4 (requesting the  continuing "assistance of the United States Forces for the purposes of supporting Iraq in its efforts to maintain security and stability in Iraq, including cooperation in the conduct of operations against al-Qaeda and other terrorist groups"); *see also* Tim Arango, *War in Iraq Defies U.S. Timetable for End of Combat*, N.Y. Times, July 2, 2010, at A1.

Due to its significantly restricted access to Iraqi population centers, however, *see* SOFA Arts. 5, 6, the Army has had to delegate to private contractors the "critical capabilities" of gathering and analyzing information about the constantly evolving political, economic and social climate in which the Army operates, *see* Admin. R. ("AR") 58–60.  Guarding against an

---

[1] "Agreement Between the United States of America and the Republic of Iraq on the Withdrawal of United States Forces from Iraq and the Organization of Their Activities during Their Temporary Presence in Iraq" (Nov. 17, 2008) (attached to Def.'s Mot. for J.), *available at* http://graphics8.nytimes.com/packages/pdf/world/20081119_SOFA_FINAL_AGREED_TEXT.pdf.

[2] *See generally* Army Field Manual 3-24: Counterinsurgency (December 15, 2006) (defining the Army's modern counterinsurgency doctrine, as reconceived in light of the Army's experiences in Iraq and Afghanistan), *available at* http://www.fas.org/irp/doddir/army/fm3-24.pdf; *see also* Michael R. Gordon, *Military Hones a New Strategy on Insurgency*, N.Y. Times, October 5, 2006 at A1; Greg Jaffe, *Next Chapter: As Iraq War Rages, Army Re-Examines Lessons of Vietnam --- Recent Books Pan Doctrine of Overwhelming Power When Fighting Guerrillas --- A Gift for Donald Rumsfeld*, Wall St. J., March 20, 2006, at A1.

interruption in the flow of this information is critical both to the success of the Army's ongoing counterinsurgency operations and to safeguarding the lives of American soldiers. *See, e.g.*, 1st Decl. of Andrew S. Price ¶¶ 4–5 (July 16, 2010) ("1st Price Decl.") (attached to Def.'s Mot. for J.).

In order to meet this growing need for private-contractor support, the Army, on October 30, 2009, issued Request for Proposals No. W52P1J-09-R-0079 (the "Solicitation" or "RFP") to procure "Advisory, Atmospheric and Analysis Support Services." AR 2. Despite this somewhat cryptic label, the services procured under the RFP are straightforward. Under the "Atmospheric" component of the contract, the awardee would be responsible for collecting a wide range of information from Iraqi government and military officials, religious and tribal leaders, as well as ordinary Iraqi citizens, concerning popular perceptions of key events, of the Iraqi and American military, and of important political, economic, and security issues. AR 59–60; *see* AR 65–66. In the past, such "human intelligence" has assisted the counterinsurgency effort and has helped soldiers avoid roadside bombs and other hazards. 2d Decl. of Steven R. Mount ¶ 5 (July 11, 2010) ("2d Mount Decl.") (attached to Def.'s Mot. for J.); 1st Price Decl. ¶¶ 4–5. Under the "Advisory" and "Analysis" components of the contract, the awardee would be responsible for recruiting civilian personnel with expertise in Iraqi culture, religion, politics, economics, tribal issues, and other issues specific to the region; these personnel would provide the Army with daily advice and recommendations, based upon their expert analysis of the collected information or "atmospherics." AR 48, 58–60. In short, the prospective awardee of the "Advisory, Atmospheric and Analysis Services" ("AAA") contract would essentially become the Army's eyes and ears on the ground in Iraq. *See* AR 58–60; 2d Mount Decl. ¶ 3.

Eight offerors responded to the RFP, including plaintiff and intervenor. AR 586–87. On February 17, 2010, the Army awarded the contract to intervenor. AR 621–22. After an unsuccessful protest at the United States Government Accountability Office ("GAO"), *Linc Gov't Servs., LLC*, B-402558 *et al.*, (Comp. Gen. March 26, 2010), plaintiff filed the instant protest on June 17, 2010, alleging that the Army's award to intervenor was arbitrary, capricious, and otherwise in violation of procurement regulations. Plaintiff's amended complaint recites six counts of error in the procurement, specifically, that: (1) the Army's evaluation of price departed from the stated terms of the RFP and was otherwise unlawful; (2) alternatively, the stated terms of the RFP were latently ambiguous as to the intended method for evaluating price; (3) the Army unlawfully conducted exclusive "discussions" with intervenor and no other offeror; (4) the Army's Source Selection Authority ("SSA") improperly evaluated the past performance of all offerors; (5) the SSA impermissibly excluded plaintiff's proposal from the required trade-off analysis; and (6) the Army improperly evaluated the technical merit of intervenor's proposal. Am. Compl. ¶¶ 65–138.

Cautious not "to substitute its judgment for that of the [procuring] agency," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)—and with "due regard to the interests of national defense and national security," 28 U.S.C. § 1491(b)(3)—the court finds in favor of defendant on all counts, denies plaintiff's motion for injunctive relief, and dismisses the protest with prejudice.

# I. BACKGROUND

As noted above, the prospective awardee of the AAA contract was to provide the Army with daily advice and recommendations, based upon expert analysis of a wide range of information gathered from Iraqi officials and the populace. The RFP allocated the procured services among eleven contract line item numbers ("CLINs"), largely according to the type of personnel position that the awardee would be required to fill. *See* AR 5–7, 140–41. For example, under CLIN 0011, the awardee would be required to hire "Iraqi Local National Advisors" ("LNAs"), who would be "the 'eyes and ears' of what is happening in all sectors of Iraqi society, in places that are not accessible" to the Army. AR 65. It would be the primary task of LNAs to gather the critical "atmospheric" information described above. AR 65–66. In turn, under CLIN 0005, the awardee was to hire "Military Analysts" whose responsibility would be to "recruit, employ, and manage" LNAs, to "advise the [Army] on the capabilities and limitations of LNAs," and to produce for the Army "spot and weekly reports" based upon the information relayed by LNAs. AR 74. All procured services were to be provided on a firm-fixed price basis,[3] under an indefinite delivery/indefinite quantity ("IDIQ") contract, with a base period of performance ending August 14, 2010,[4] followed by three six-month option periods. AR 2. The RFP announced the Army's intent to award a single contract, without negotiations or discussions.[5] AR 3, 53.

Section M of the RFP specified three "evaluation factors" for the evaluation of proposals: (1) technical, (2) past performance, and (3) price. AR 53. Under the technical evaluation factor, the Army was to evaluate the offeror's "ability to recruit, vet, deploy, train, manage and supervise personnel," the offeror's "strategy for developing and maintaining an extensive network of Iraqi LNAs," as well as the offeror's "transition plan" for becoming "fully operational within 45 days from contract award." AR 54. The RFP required the Army to evaluate the technical factor on a pass/fail—or, in Army jargon, "Go/No-Go"—basis. AR 54. An offeror evaluated as "No-Go" under the technical evaluation factor would "not receive further consideration for award." AR 47. For offerors receiving a "Go" technical rating, the Army was then to evaluate the offerors on past performance and price. AR 54. The RFP provided that past performance was "significantly more important than price," but that the "closer the ratings in the [p]ast [p]erformance factor, the more significant price [would] become[]." AR 54. With this guidance in mind, the RFP required the

---

[3] Two CLINs—CLINs 0008 and 0009 for mobilization, demobilization, and other direct costs— were cost-reimbursable, AR 6–7, but were not to be considered for purposes of evaluation and award selection, AR 49.

[4] Because the RFP anticipated that contract performance would begin on February 15, 2010, the duration of the base period was also designated as six months, AR 2; this was to include a 45-day "transition" phase for the awardee to become fully operational, AR 48. However, the Army's award decision did not issue until February 17, 2010. AR 622. Thereafter, as detailed below, post-award litigation at GAO would delay the start of contract performance until June 2010. *See infra* Procedural History.

[5] *See* FAR 15.306(d) (defining "discussions" or "negotiations" as "exchanges" with each offeror, following the submission of proposals, "that are undertaken with the intent of allowing the offeror to revise its proposal"); FAR 15.306(a)(3) ("Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions.").

Army to conduct a "trade-off" based on a comparative assessment of price and past performance, in order to select the proposal providing the "best value" to the government.[6] AR 53–54.

As already noted, eight offerors responded to the RFP, including plaintiff and intervenor.[7] AR 586. An evaluation team located in Iraq conducted the initial technical evaluation of all proposals. AR 588. Per the terms of the RFP, AR 54, the evaluation team rated each offeror as either "Go" or "No-Go" under the technical evaluation factor, AR 588. One offeror, Offeror D, was rated "No-Go," AR 590–92; consistently with the RFP's instruction, AR 47, Offeror D's proposal received no further consideration, AR 593–94. The technical evaluation team assigned the proposals of the remaining seven offerors, including plaintiff and intervenor, a "Go" technical rating. AR 593. The SSA reviewed these technical evaluations and agreed with the ratings. AR 594. Accordingly, the SSA proceeded to evaluate the past performance of the seven offerors with Go-rated (technically acceptable) proposals. AR 594–600.

## A. The Past Performance Evaluation

Guidance for this evaluation came, in part, from the RFP's instruction that past performance was to be evaluated as a "predictor of future contract performance," or, more specifically, as "an assessment of the probability that the offeror [would] complete the instant requirement successfully and in accordance with the contract terms." AR 54. In its proposal, each offeror was required to provide information on a maximum of three "contract references"— meeting the RFP's definition of "recent and relevant contracts"—both for the offeror itself, as well as for each subcontractor that would perform a portion of the work exceeding 25% of the contract value. AR 48–49. The RFP defined contracts as "recent" if they were performed no more than three years prior to the closing date of the Solicitation. AR 48. Contracts were defined as "relevant" if they were "of similar scope and complexity" and provided "services incorporating key job skills similar to those outlined in the" RFP's Performance Work Statement; "[p]articularly relevant" were contracts performed outside the United States. *Id.*

For each referenced contract, an offeror was required to provide a range of information— including the type of contract, period of performance, and a description of the services provided— and to designate a reference "Point of Contact" ("POC"). *Id.* To each reference POC, the offeror was required to send a past performance questionnaire ("PPQ"), which the POC was instructed to complete and return directly to the Army by the stated deadline.[8] *Id.* The RFP warned that, for purposes of evaluation, no PPQ received directly from an offeror would be considered, *id.*, and that each "offeror is responsible for ensuring prompt submission of completed [PPQs]," AR 49.

---

[6] *See* FAR 15.101 ("Best value continuum") ("An agency can obtain best value in negotiated acquisitions by using any one or a combination of source selection approaches"); FAR 15.101-1(a) ("A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."); FAR 15.101-1(c) ("This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal.")

[7] The other six offerors were: SOS International, Ltd. ("SOSI"); CALNET, Inc. ("CALNET"); Offeror A; Offeror B; Offeror C; and Offeror D. *See* Appendix A; AR 586–87.

[8] The Army provided offerors with a blank PPQ as an attachment to the RFP; the last page of the PPQ indicated a deadline of November 23, 2009 for receipt of completed PPQs. AR 114–18.

Importantly to this case, the RFP stated that the Army is "UNDER NO OBLIGATION TO REQUEST COMPLETED QUESTIONNAIRES FROM OFFEROR'S REFERENCE POCs," *id*., and "is not required to contact and/or interview all [r]eference POCs identified by offerors," AR 55.

The PPQ instructed the POC to rate various aspects of the offeror's performance under the referenced contract along a numerical "risk" scale of 1 to 4—with a numerical score of "1" being "unsatisfactory" or "high risk" and a score of "4" being "excellent" or "very low risk." AR 115. For each aspect of the offeror's past performance, such as "Program Management" or "Cost Performance," the PPQ included a section titled "Remarks," which permitted the POC to augment the numerical ratings with qualitative comments. *See* AR 115–18. The PPQ concluded with a section titled "Narrative Summary" that invited the POC to identify the "most positive" and "most negative" aspects of the offeror's performance under the referenced contract, as well as to provide any "additional comments . . . as desired." AR 118. In turn, under the terms of the RFP, the SSA[9] was to "evaluate recent and relevant past performance information" for each offeror "based on completed [PPQs] submitted by the Contract Reference POCs." AR 54. Based upon the completed PPQs, the SSA was to assign each offeror a "risk rating" for past performance that correlated to different numerical "risk ranges," as follows:

| Numerical Risk Range | Associated Risk Rating |
|---|---|
| 3.7 – 4.0 | Very Low |
| 3.0 – 3.6 | Low |
| 2.0 – 2.9 | Moderate |
| 0.0 – 1.9 | High |

*Id.*

Beyond the basic information provided in offerors' proposals, completed PPQs were the only source of past performance information that the SSA was required to consider in her evaluation. *See id.* The RFP did not, however, bind the SSA to a mechanical assignment of risk ratings based upon the PPQ numerical scores. *Id.* Rather, the SSA was permitted to adjust her past performance risk rating for a given offeror based upon the "qualitative comments" in the completed PPQs as well as "other qualitative aspects" of the offeror's past performance information, "such as particularly relevant overseas contracts." *Id.*

The RFP further permitted, but did not require, the SSA to rely upon past performance "information obtained from other sources, including but not limited to Government sources." AR 55. Also left to the SSA's discretion was consideration of the past performance information for an

---

[9] Although the RFP refers to evaluation by "the Government," AR 54, the Army designated a Source Selection Authority, Susan M. Pharis, to conduct the evaluation of proposals and to select the awardee. *See* AR 585–601 (the SSA's "Source Selection Decision Document"); *see also* AR 47 (Section L of the RFP, referring to "the review process [by] the Source Selection Authority (SSA) and/or evaluator(s)").

offeror's "other corporate entities or subcontractors."[10]  *Id*.  More generally, it was within the SSA's discretion to consider a range of qualitative factors in her evaluation of an offeror's past performance including "the currency, degree of relevance, source and context" of the available information, as well as the offeror's "general trends in performance and demonstrated corrective actions."  *Id*.  Consistently with this, each offeror was required to "identify in its proposal every contract," without limit on the number of such contracts, in which it experienced "any performance delays" or "quality problems," as well as "[e]very recent contract that was terminated, or cancelled for any reason in whole or in part."  AR 49 (emphasis in original).

Based upon the completed PPQs—as well as other past performance information that the SSA elected, in her discretion, to consider—the SSA was to assign each offeror one of the four past performance risk ratings noted above.  AR 55.  The RFP amplified its guidance with verbal definitions for these risk ratings.  *Id*.  Specifically, the RFP provided that a risk rating of "Very Low Risk" was to be assigned where "very little doubt" existed that an offeror would successfully perform the contract, if selected for award; in turn, the RFP defined the remaining risk ratings of "Low Risk," "Moderate Risk," and "High Risk" as corresponding, respectively, to "little," "some," and "significant" doubt concerning a prospective awardee's successful performance of the contract.  *Id*.  Finally, for an offeror with "little or no recent/relevant past performance upon which to base a meaningful performance risk prediction," the RFP mandated a risk rating of "Unknown Risk," which meant that the offeror was not to be "evaluated favorably or unfavorably on past performance."  *Id*.

The SSA documented the past performance evaluation in the Source Selection Decision Document ("SSDD"), issued on February 12, 2010.  Therein, the SSA explained that, in addition to the information provided in the offerors' proposals, information obtained from three other sources was also considered.  AR 594.

First, as to the information required by the RFP, AR 54, the SSA considered the completed PPQs for those contracts that were determined to be recent and relevant.  AR 594; *see* AR 48.  In addition, the SSA exercised her discretion, *see* AR 55, by considering past performance information obtained from two other sources, AR 594.  Specifically, the SSA conducted a search of the Past Performance Information Retrieval System ("PPIRS"), a government-wide online database of performance assessment "Report Cards" for government contractors.[11]  AR 594.  The SSA also conducted an Internet search, using the Google search engine, "to determine if any negative publicity existed" for any offeror.  *Id*.

The SSA's Google search uncovered no negative publicity for any offeror except for Offeror A.  AR 594–98.  As to Offeror A, the SSA's Google search apparently "led to the discovery of POGO.org, an organization that attempts to compile a database of companies with histories of misconduct such as contract fraud and environmental, ethics and labor violations."  AR 595–96.  The SSA noted that "[Offeror A] had several instances where such occurrences" of misconduct "were reported, with two cases pending."  *Id*.  Because the "outcome of these cases ha[d] not been determined" at the time of the SSA's decision, however, "this information did not

---

[10] The SSA was, however, required to consider the past performance of an offeror's subcontractors that would perform a portion of the work exceeding 25% of the contract value.  *See* AR 48–49.
[11] *See* http://www.ppirs.gov.

affect the [SSA's] past performance rating" for Offeror A.  *Id*.

The SSA's PPIRS search uncovered a generally favorable "past performance assessment" on one prior contract for each of three offerors, Offeror A, Offeror B, and intervenor.  AR 594–96. The search yielded no "assessment report cards" for any of the remaining offerors, plaintiff among them.  AR 595, 597–98.

Finally, with the notable exceptions of plaintiff and intervenor, the Army received, and the SSA considered in the past performance evaluation, three completed PPQs for each offeror.[12]  *See* AR 594–99.  Significantly for this case, "[n]o PPQs were received" at all for plaintiff.  AR 598; *see* AR 323–26.  As for intervenor, the Army received two completed PPQs that identified intervenor as the contractor, AR 539–51, and a third that identified the contractor as Global Linguist Solutions ("GLS"), a joint venture between intervenor and Offeror A, AR 557–61.  The SSA included only the first two PPQs in the evaluation of intervenor's past performance; the reasons for this decision were documented as follows.  AR 596–97.

First, the SSA noted that, while GLS had received moderate to poor overall ratings of [number redacted] and [number redacted]—along the numerical scale described above—for "Program Management" and "Cost Performance," respectively, the "[r]ationale received" for both ratings was tied to "excessive subcontractor costs" and "poor negotiating of those subcontractor costs."  AR 596–97; *see* AR 558–60.  By contrast, the SSA noted that the instant procurement was to "result in a Firm Fixed-Price IDIQ contract" in which price would "not [be] subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  AR 597 (quoting FAR 16.202-1).

Second, the SSA noted that "when McNeil was *contacted*, [it] informed the [Army] that, if selected" for award, it did "not intend to use [GLS], nor any other GLS subcontractors," for performance of the AAA contract.  *Id.* (emphasis added).  The "contact" to which the SSA referred was apparently an email exchange between intervenor, the contract specialist and the contracting officer.  AR 323–25.  Although intervenor's proposal did not identify GLS among the "Team" of companies that intervenor intended to use for performance of the AAA contract, *see* AR 444, 446, the Army's receipt of a PPQ for GLS (the "GLS PPQ") apparently sparked some confusion within the Army on this point, *see* AR 580–81.  On December 29, 2009, the contract specialist contacted intervenor by email and asked whether intervenor was "planning on working with Global Linguist Solutions" for the AAA contract, and, if so, whether GLS would "be performing 25% of the effort."  AR 580–81.  Intervenor responded that it did "not intend to subcontract any portion of the work contemplated under [the RFP] to Global Linguist Solutions." AR 580.  A few weeks later, on February 12, 2010, intervenor emailed the contracting officer to "reiterate" that it did "not intend to use any of GLS' subcontractors" for performance of the AAA contract.  AR 584.

For these reasons, the SSA decided to exclude the GLS PPQ from consideration. Specifically, "[s]ince McNeil d[id] not intend to use the joint venture of GLS nor its

---

[12] For one offeror, Offeror B, the Army also received, and the SSA considered, two PPQs submitted for Offeror B's "subcontractor, [name redacted], who w[ould] be performing over 25% of the work under the [AAA] contract."  AR 598–99.

subcontractors," and because "a FFP [or Firm-Fixed Price] IDIQ contract w[ould] be executed in which the control of costs is solely the responsibility of the prospective contractor," the SSA determined that "the ratings received for GLS should not reflect unfavorably" on intervenor.  AR 597.  For the same reasons—including the fact that, like intervenor, "[Offeror A] did not list GLS as one of [its] subcontractors nor did [it] indicate the intent to use GLS"—the SSA also concluded that "the ratings received for GLS should not reflect unfavorably" on Offeror A, intervenor's partner in the GLS joint venture.  AR 606–07.

Based upon the information in the offerors' proposals, all completed PPQs (except for the GLS PPQ), as well as the results of her Google and PPIRS searches, the SSA assigned six of the seven offerors a past performance risk rating of either "Low Risk" or "Very Low Risk," AR 599, the two best possible ratings, *see* AR 55.  As for plaintiff, however, "[d]ue to the information received from [plaintiff's] proposal and the lack of information gathered from other sources," the SSA concluded that plaintiff "had little or no recent/relevant past performance upon which to base a meaningful performance risk prediction," noting again that no PPQs were submitted on plaintiff's behalf.  AR 598.  Accordingly, the SSA determined plaintiff's risk rating to be "Unknown Risk" and that plaintiff would thus "not be evaluated favorably or unfavorably on past performance." *Id.*

## B. The Price Evaluation

As to the evaluation of price, Section M of the RFP provided that "[t]he basis of award w[ould] be a Total Evaluated Price[13] of the base period and three (3) six-month evaluated option periods."  AR 55.  In turn, the "total sum of all proposed unit prices for all CLINs for the base and ALL option periods w[ould] be the basis for determining the Total Evaluated Price."  AR 55–56.

In addition to determining each offeror's Total Evaluated Price, the RFP provided that the Army would evaluate proposals for "balanced pricing" and "price reasonableness."  AR 55.  In particular, as to price reasonableness, the Army "reserve[d] the right . . . to determine reasonableness by means of price analysis techniques," including "comparison of the proposed prices with the independent government cost estimate."[14]  *Id.*  As to balanced pricing, the RFP explained that "[u]nbalanced pricing exists when the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques."[15]  *Id.*  Accordingly, the Army was to review each offeror's pricing scheme to ensure

---

[13] "Total Evaluated Price" is a familiar term in negotiated procurements, used to denote the price measure to be used for purposes of proposal evaluation and award selection.  *See, e.g.*, FAR 15.404-1(g); *Metro. Van and Storage, Inc. v. United States*, 92 Fed. Cl. 232, 239 (2010); *Precision Images, LLC v. United States*, 79 Fed. Cl. 598, 603 (2007).

[14] The RFP's permissive language on this point—that the Army merely "reserved the right" to resort to "price analysis techniques" for determining reasonableness—is in line with the FAR's guidance that "[n]ormally, adequate price competition establishes price reasonableness."  FAR 15.404-1(b)(2)(i); *see* FAR 15.403-1(c)(1) (providing that "adequate price competition" is essentially satisfied where "[t]wo or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement").

[15] This echoed the language of FAR 15.404-1(g), which provides that "[u]nbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is

that proposed unit prices were balanced (i.e., not widely divergent) across individual CLINs, as well as across the base and option periods of the contract. *Id.* The RFP warned offerors that a proposal containing unbalanced pricing might be rejected if the Army determines that this "poses an unacceptable risk to the Government."[16] *Id.*

Offerors were to submit their proposed unit prices by completing what the RFP variably termed the "pricing matrix" or "price matrix." *See* AR 47–49. The price matrix was a Microsoft Excel spreadsheet, designated as Attachment 002 to the RFP, AR 106, and made available to offerors in electronic form.[17]

The price matrix was in part previously filled out in order to guide offerors' entry of their proposed unit prices. *See* Appendix B. In particular, the two left-most columns (Columns A and B) of the price matrix listed, respectively, the eleven individual CLINs (0001–0011) and their corresponding "Supply/Service." AR 106; *see* AR 140–41. As noted above, the "Supply/Service" for each CLIN was defined, in most instances, in terms of the personnel position to be filled, such as "Military Analyst" for CLIN 0005 or "Local National Advisor" for CLIN 0010. AR 106, 140–41; *see supra* p. 4.

The section of the price matrix to be completed by offerors consisted of four columns in which, for each CLIN, offerors were instructed to enter their proposed "unit price"—defined as the price "[p]er [d]ay [p]er [p]osition"—for each of the base period and three option periods, respectively.[18] AR 106. The bottom row of the price matrix reproduced, almost exactly, the verbal formulation provided in Section M of the RFP for how Total Evaluated Price would be calculated from offerors' proposed unit prices. *See* AR 55–56. In particular, the price matrix stated: "TOTAL EVALUATED PRICE: (This number will be calculated by adding up the UNIT prices for ALL CLINS and ALL Base and Option Periods)." AR 106.

Finally, the price matrix included two columns (Columns C and D) that provided, for each CLIN, an "'*Estimated*' Quantity of Personnel" and the "Number of Estimated Work Days in Each Period," respectively.[19] *Id.* (emphasis in original). The price matrix contained a warning to offerors that the numbers provided under the "'*Estimated*' Quantity of Personnel" for each CLIN were "not definitive contract requirements" but were "provided as *estimates* ONLY for evaluation

---

significantly over or understated as indicated by the application of cost or price analysis techniques."

[16] Here, again, the RFP echoed FAR 15.404-1(g), which cautions that "[u]nbalanced pricing may increase performance risk and could result in payment of unreasonably high prices."

[17] As of the date of this opinion, the electronic price matrix is available at http://www4.osc.army.mil/padds_web/amc.asp?sol=W52P1J09R0079; for ready reference, a print-out of the price matrix is provided in Appendix B.

[18] No unit prices were required for CLINs 0008 and 0009, which were not to be included in the Army's price evaluation. AR 49.

[19] These two columns were left blank for CLINs 0008, 0009, and 0011. As noted above, CLINs 0008 and 0009 were "cost reimbursable" and were not to be considered for evaluation purposes, AR 49, while CLIN 0011, for "Contractor Manpower Reporting," was a periodic reporting requirement that was independent of the quantity of personnel or number of days of performance, *see* AR 104–05.

purposes!" *Id.* (emphasis in original). The right-most column (Column J) of the price matrix was titled "Total Amount," a measure defined as "the addition of all Unit Prices Proposed multiplied by Columns C [Estimated Quantity] and D [Number of Estimated Work Days])." *Id.* The electronic price matrix contained embedded mathematical formulae in Column J; these embedded formulae automatically calculated the Total Amount for each CLIN and, in the bottom cell of the column (Cell J14), the Total Amount for *all* CLINs. *See* AR 106, 2101.

Per the RFP's instruction, offerors' completed price matrices did not include proposed prices for the two cost-reimbursable CLINs, CLINs 0008 and 0009, which were to be omitted from the Army's evaluation of proposals. *See* AR 49; *supra* note 3. For CLINs 0001–0007, offerors proposed unit prices on the order of a few hundred dollars, ranging from approximately $300 to approximately $1200 across CLIN and contract period. *See* AR 321, 536, 936, 1295, 1485, 1814, 2017. For CLIN 0010, offerors proposed unit prices ranging from approximately $15 to $42 across contract period. *See id.* Finally, for CLIN 0011, most offerors proposed to charge the Army little or nothing; accordingly, these offerors' price matrices either left the CLIN 0011 unit prices blank or showed a nominal value of $1. *See* AR 536, 936, 1295, 1485, 1814. In sharp contrast, plaintiff proposed unit prices for CLIN 0011 that ranged from $[number redacted] to $[number redacted] across contract period. AR 321. Each offeror's price matrix also included the automatically calculated Total Amount for all CLINs. Intervenor and plaintiff had the two lowest Total Amounts of approximately $87 million and $[number redacted] million, respectively, AR 321, 536, while the remaining offerors with technically acceptable (Go-rated) proposals had Total Amounts of approximately $[number redacted]–$[number redacted] million, AR 936, 1295, 1485, 1814, 2017.

The Army's Financial Services Branch ("FSB")—in consultation with the SSA and the contract specialist—conducted the price evaluation and analysis. *See* AR 617–20. This analysis included a "review [of] the price matrices of all offerors for evidence of unbalanced pricing." AR 617. The first part of this review "consisted of a visual scan of the unit prices submitted to see if there w[ere] any contract line item[s] (CLINs) which were significantly over or understated." *Id.* The "only potential instance of this occurrence was evidenced in [plaintiff's] price matrix, where [plaintiff] proposed tremendous amounts for CLIN 0011." *Id.* The second part of the balanced-pricing review sought to determine whether offerors' ranking according to Total Evaluated Price differed from their ranking according to Total Amount. *Id.* "Once again, no evidence of unbalanced pricing was evident, except for in the case of [plaintiff]," which had the highest Total Evaluated Price, but the second lowest Total Amount. *Id.*; *see* AR 618.

For the purpose of evaluation and selection for award, it appears that at least one analyst with the FSB was initially unclear as to whether offerors were to be ranked based upon Total Evaluated Price or Total Amount. *See* AR 618–20. The FSB analyst, Steven Talbert, discussed this perceived "discrepancy" with the contract specialist for the project, AR 618, who, in turn, consulted the SSA, AR 620. The latter two concluded that no discrepancy existed, because "the language on the price matrix for Total Evaluated Price determination was in agreement with the language used in Section M." AR 620.

Pursuant to that consultation, the FSB "determined to evaluate and rank the offerors' proposals in accordance with the instructions in section M of the Solicitation," based upon "the total sum of all proposed unit prices for all CLINs for the base and ALL option periods." AR 618.

The FSB summarized its price evaluation in a memorandum to the contract specialist; this summary included a table providing both the Total Amount for all CLINs (taken from offerors' price matrices) and Total Evaluated Price (calculated by the FSB) for each offeror, with offerors ranked according to Total Evaluated Price. *Id.*

Intervenor ranked first in the FSB's price evaluation, with a Total Evaluated Price of approximately $16,203, while plaintiff ranked a distant last, with a Total Evaluated Price of $[number redacted]. *Id.* For all remaining offerors, Total Evaluated Price ranged from approximately $[number redacted] to $[number redacted]. *Id.* The FSB recognized that plaintiff's anomalously high Total Evaluated Price was due to its proposed unit prices for CLIN 0011, whereas "[a]ll other offerors left CLIN 0011 blank or proposed minimal amounts that had no impact on the[ir] rankings." AR 618–19. However, the FSB noted that, "[i]n the event this was an error"—and even if the FSB were to exclude CLIN 0011 from its calculation of plaintiff's Total Evaluated Price—this "would most likely not . . . impact[] [plaintiff's opportunity for award]," because plaintiff would still be "ranked number six" in price.[20] *Id.* Accordingly, having concluded that intervenor's price was otherwise "fair and reasonable based on FAR 15.404-1(b)(2)(i) 'adequate price competition,'" the FSB "recommend[ed]" that the Army "accept [intervenor's] proposal as the low offeror." AR 619. The SSA adopted the FSB's price analysis and evaluation, and agreed that, "[b]ased on FAR 15.404-1(b) price analysis," the prices proposed by intervenor were "fair and reasonable." AR 600.

### C. The Trade-Off Analysis

The following table thus summarizes the results of the Army's evaluation of price and past performance for the seven offerors with technically acceptable (Go-rated) proposals:

| Offeror | Total Evaluated Price | Past Performance Risk Rating |
| --- | --- | --- |
| Intervenor | $16,302.92 | Very Low Risk |
| SOSI | $[number redacted] | Very Low Risk |
| CALNET | $[number redacted] | Low Risk |
| Offeror A | $[number redacted] | Low Risk |
| Offeror B | $[number redacted] | Very Low Risk |
| Offeror C | $[number redacted] | Very Low Risk |
| Plaintiff | $[number redacted] | Unknown Risk |

*See* AR 599–600.

With these results in mind, the SSA began the trade-off analysis by recognizing that, "as stated in the RFP, the [p]ast [p]erformance factor is significantly more important than [p]rice," but

---

[20] The FSB's price evaluation was apparently conducted independently of the Army's technical evaluation of proposals and without consideration for the results of that evaluation; accordingly, the FSB's price evaluation included all eight offerors, Offeror D (whose proposal was rated "No-Go") among them. *See* AR 618. Eliminating CLIN 0011 from the calculation of plaintiff's Total Evaluated Price would have left plaintiff ranked fifth among the seven offerors with technically acceptable (Go-rated) proposals. *See id.*

the "closer the ratings in the [p]ast [p]erformance factor, the more significant [p]rice becomes." AR 601 (quoting the RFP at AR 54). The SSA noted that four offerors—intervenor, SOSI, Offeror B, and Offeror C—had received the same past performance rating of "Very Low Risk," the best possible rating. *Id.* The SSA performed a trade-off analysis for these four offerors, and "determined that the differences" in their past performance "were negligible and did not warrant paying the additional price premium for these services." *Id.* Accordingly, the SSA "determined one award to [intervenor] to be in the best interest of the Government, as it offers the best overall value." *Id.* Five days later, on February 17, 2010, the Army formally awarded the AAA contract to intervenor. *See* AR 621–22.

### D. Procedural History

Nine days after award of the contract, plaintiff filed its protest at GAO, alleging four points of error in the Army's evaluation of proposals and its conduct of the procurement. AR 719–22. Specifically, plaintiff alleged that: (1) the Army's price evaluation was unlawful; (2) alternatively, the RFP was ambiguous as to how price would be evaluated; (3) the Army unlawfully engaged in "discussions" with the awardee (intervenor) but not with plaintiff; and (4) the Army improperly evaluated the past performance of all offerors. *See* AR 720–22. These allegations essentially track the first four counts of plaintiff's instant complaint. *Compare* AR 720–22 *with* Am. Compl. ¶¶ 65–119.

Upon receiving notice of plaintiff's protest and a concurrent protest lodged by another offeror, *Calnet, Inc.*, B-402558.2 *et al.*, 2010 CPD ¶ 130 (Comp. Gen. June 3, 2010), the contracting officer issued a Stop Work Order, pursuant to FAR 52.233-3, ordering intervenor to suspend all contract performance.[21] AR 718. A protest by yet a third offeror, *SOS Int'l, Ltd.*, B-402558.3 *et al.*, 2010 CPD ¶ 131 (Comp. Gen. June 3, 2010), would ultimately prolong the suspension of contract performance until June 8, 2010.[22] *See* Pl.'s Mot. for Prelim. Inj. at 8 (citing the Army's Start Work Order).

Pending resolution of the GAO protests—and, before that, pending the Army's selection of an awardee for the AAA contract—the Army relied on a series of bridge contracts to meet the subject requirements. *See* AR 155; Am. Compl., Ex. S; 1st Decl. of Steven R. Mount ¶ 3 (June 21, 2010) ("1st Mount Decl."). The last concurrent pair of bridge contracts was awarded to plaintiff and SOSI, and terminated on August 7, 2010. *See* Am. Compl., Ex. S; 1st Mount Decl. ¶ 3. With that date in mind, intervenor ultimately commenced its 45-day transition phase on June 24, 2010, in order to become fully operational upon termination of the bridge contracts. Def.'s Combined Mot. to Dismiss and Resp. to Pl.'s Mot. for Prelim. Inj. ("Def.'s Mot. to Dismiss") at 32; *see* 1st Mount Decl. ¶ 3 (noting that intervenor was required to begin providing the procured services on August 8, 2010); AR 48, 622.

---

[21] This suspension of contract performance is mandatory under the Competition in Contracting Act, which provides that, upon notice of a protest at GAO, "the contracting officer shall immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." 31 U.S.C. § 3553(d)(3)(A)(ii).

[22] *See* 31 U.S.C. § 3553(d)(3)(B) (providing that "[p]erformance and related activities suspended . . . by reason of a protest may not be resumed while the protest is pending.").

Meanwhile, GAO had dismissed all three protests lodged against the Army. In particular, GAO concluded that plaintiff had waived its right to challenge the Army's price evaluation, had no standing to challenge the Army's past performance evaluation, and otherwise had no valid basis for protest. AR 721–22. On March 26, 2010, in an unpublished opinion, GAO dismissed plaintiff's protest. AR 722; *Linc Gov't Servs., LLC*, B-402558 *et al.*, at *4. GAO found the allegations raised by CALNET and SOSI to be similarly lacking in merit and, on June 3, 2010, dismissed both of those protests. *Calnet, Inc.*, 2010 CPD ¶ 130, at *3; *SOS Int'l, Ltd.*, 2010 CPD ¶ 131, at *4.

Shortly thereafter, plaintiff filed the instant action. Compl. at 1. Along with its original complaint, plaintiff filed a motion for a temporary restraining order and preliminary injunction, pursuant to RCFC 65(a),(b), seeking to enjoin contract performance by intervenor, pending final disposition of this action. Pl.'s Mot. for Prelim. Inj. at 1. Along with their oppositions to plaintiff's motion for preliminary relief, defendant and intervenor responded with motions to dismiss the protest for lack of jurisdiction, pursuant to RCFC 12(b)(1). Def.'s Mot. to Dismiss at 1, 7–10; Intervenor's Combined Mot. to Dismiss and Resp. to Pl.'s Mot. for Prelim. Inj. ("Intervenor's Mot. to Dismiss") at 16–18. Plaintiff subsequently filed a motion to amend its complaint, Pl.'s Mot. to Amend Compl. at 1, as well as a motion for discovery, in which plaintiff asked, among other things, for the court's leave to depose the contract specialist as well as one of intervenor's employees, Pl.'s Mot. for Discovery at 8.

The court heard oral argument on these motions on July 7, 2010. At the hearing, the court: (1) denied plaintiff's motion for discovery, (2) denied plaintiff's motion for a preliminary injunction; (3) denied defendant and intervenor's jurisdictional motions to dismiss; and (4) granted plaintiff's motion to amend the complaint. *See* Order Memorializing Oral Argument (July 8, 2010), ECF No. 42; Hr'g Tr. at 48, 175–88 (July 7, 2010).

Shortly after the hearing, plaintiff moved to supplement the administrative record. That motion was the subject of the court's opinion in *Linc Gov't Servs., LLC v. United States*, No. 10-375 (Fed. Cl. October 21, 2010).

The case is now before the court on the parties' cross-motions for judgment on the administrative record, *see* RCFC 52.1, as to plaintiff's amended complaint, which recites the six Counts enumerated in the introduction, Am. Compl. ¶¶ 65–138. Also before the court is plaintiff's motion for a permanent injunction. Before ruling on these motions, the court begins by explaining more fully its reasons for denying the jurisdictional motions to dismiss, which raise issues of continuing vitality in the court and thus warrant more extended treatment than the court's bench ruling permitted.

## II. JURISDICTION

It is worth quoting the main jurisdictional font of the Court of Federal Claims, the Tucker Act. It is this statute that gives rise to the concept of "prejudice," discussed below, which is misunderstood and thus a source of confusion. Simply put, the Tucker Act grants the court "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a

proposed procurement." 28 U.S.C. § 1491(b)(1). In order to have standing to sue as an "interested party" under § 1491(b)(1), a disappointed offeror must show that it suffered competitive injury or "prejudice" as a result of the challenged agency decisions. *Info. Tech. & Applications Corp. v. United States* ("*ITAC*"), 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006). To make this required showing of prejudice in a post-award bid protest, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has held that a plaintiff "must show that there was a substantial chance it would have received the contract award but for the alleged error in the procurement process." *ITAC*, 316 F.3d at 1319. This equation of "prejudice" with "competitive injury" and "substantial chance" appears clear enough. In practice, however, application of the concept of prejudice has been anything but clear.

### A. Defendant's and Intervenor's RCFC 12(b)(1) Motions To Dismiss

In their respective motions to dismiss the protest for lack of jurisdiction, defendant and intervenor argue that plaintiff cannot satisfy the "substantial chance" test for prejudice (the origin and meaning of this requirement is explained more fully below) and thus lacks standing to sue. Def.'s Mot. to Dismiss at 8; Intervenor's Mot. to Dismiss at 16. Because both parties make essentially identical arguments, the court addresses their two motions jointly and, for ease of exposition in this section of the opinion, refers to defendant and intervenor collectively as the "movants." To be sure, the court has discerned that both defendant and intervenor advance the same central argument, which proceeds as follows.

First, the movants argue that plaintiff has waived its right to bring what they contend are untimely challenges to the Army's price evaluation. *E.g.*, Def.'s Mot. to Dismiss at 10–11 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (2007) ("*Blue & Gold*")); Intervenor's Mot. to Dismiss at 25–27 (same). For this, the movants rely entirely upon the Federal Circuit's decision in *Blue & Gold*, which held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313. The Federal Circuit thus recognized a "waiver rule" that applies to allegations of either a "patent error" (an unlawful requirement or evaluation criterion) or a "patent ambiguity" in the terms of a solicitation. *Id.* at 1313–15. This waiver rule precludes the court from adjudicating a disappointed offeror's untimely challenge to the terms of a government solicitation. *Id.* at 1315.

Here, plaintiff alleges that the Army's price evaluation was unlawful because it departed from the express terms of the Solicitation and failed to give meaningful consideration to the true cost of the AAA contract. Am. Compl. ¶¶ 66–70 (Count 1). In the alternative, plaintiff alleges that the Solicitation was latently ambiguous as to how the Army intended to evaluate price. Am. Compl. ¶¶ 73–81 (Count 2). Under both Counts 1 and 2, the target of plaintiff's allegations is the Army's method for calculating Total Evaluated Price (the basis for award). Pl.'s Mot. for J. at 33–42; Pl.'s Combined Resp. to Def.'s and Intervenor's Mots. for J. ("Pl.'s Resp.") at 10–18.

The movants counter that the Army calculated Total Evaluated Price precisely as the clear and unambiguous terms of the Solicitation instructed. Def.'s Mot. to Dismiss at 10–11; Intervenor's Mot. to Dismiss at 18–20. The movants thus conclude that plaintiff's challenge to the

lawfulness of the Army's price evaluation is a challenge to an alleged patent error in the terms of the Solicitation.  Def.'s Mot. to Dismiss at 10–11; Intervenor's Mot. to Dismiss at 25–27.  In addition, the movants argue that any ambiguity in the Solicitation as to how Total Evaluated Price would be calculated was a patent ambiguity, apparent on the face of the Solicitation.  *Id.*  Accordingly, the movants conclude that plaintiff's challenges to the Army's price evaluation, under both Counts 1 and 2, are untimely objections to the terms of the Solicitation and are "barred by the Federal Circuit's holding" in *Blue & Gold*.  Intervenor's Mot. to Dismiss at 25; *see* Def.'s Mot. to Dismiss at 10–11.

Critically, the movants posit that the waiver rule of *Blue & Gold* creates a *jurisdictional* requirement.  *E.g.*, Def.'s Mot. to Dismiss at 11; Intervenor's Mot. to Dismiss at 27.  For example, intervenor asserts that, through operation of the waiver rule, plaintiff "cannot overcome its position as the highest price" offeror and "[c]onsequently is not an interested party."  Intervenor's Mot. to Dismiss at 27.  For its part, defendant is more explicit in characterizing this as a "jurisdictional flaw" in plaintiff's challenge to the price evaluation.  Def.'s Mot. to Dismiss at 11.  Surprisingly, neither of the movants articulates any basis for its assertion that the waiver rule is jurisdictional in character.  All the same, the movants argue that operation of the waiver rule deprives the court of jurisdiction over plaintiff's claims under Counts 1 and 2, and that both claims must be dismissed.  *Id*.

As a result, the movants contend, plaintiff may not include the Army's price evaluation among the alleged errors in the procurement for the purpose of demonstrating prejudice.  Def.'s Mot. to Dismiss at 10–11, 13; Intervenor's Mot. to Dismiss at 27.  Put another way, the movants argue that the court may not consider the allegations under Counts 1 or 2 when determining whether plaintiff has standing to sue.  *See* Def.'s Mot. to Dismiss at 10–11, 13; Intervenor's Mot. to Dismiss at 27.  In the movants' view, plaintiff must satisfy the "substantial chance" test based only upon its remaining allegations under Counts 3–6; this would task plaintiff with demonstrating a substantial chance of being awarded the AAA contract even as the highest-priced offeror.  *See* Def.'s Mot. to Dismiss at 10–11, 13; Intervenor's Mot. to Dismiss at 27.  Neither defendant nor intervenor proffers any basis for this view of the test for prejudice.  Nevertheless, having postulated this constraint, the movants conclude that the court must dismiss the entire protest for lack of jurisdiction, on the ground that plaintiff lacks standing to sue.  Def.'s Mot. to Dismiss at 10–11, 14; Intervenor's Mot. to Dismiss at 27.

Through this central argument, the movants weave what appears to be a second argument in support of their challenge to plaintiff's standing.  Defendant contends that plaintiff "has no direct economic interest in the award of this contract because," as the seventh-ranked offeror in both price and past performance, "it *did not* have a substantial chance of award" and "*was* outside the zone of consideration."  Def.'s Mot. to Dismiss at 9, 14 (emphases added).  In a slight variation on this logic, intervenor argues that "there is no reasonable possibility that [plaintiff] could hope to receive an award in this procurement, even in the unlikely event that *some* of its protest grounds were sustained."  Intervenor's Mot. to Dismiss at 17 (emphasis added).  By way of example, intervenor posits that, even if plaintiff were hypothetically assigned the best possible rating for past performance, plaintiff still would not have a substantial chance of award because it would remain the highest-priced offeror.  Intervenor's Mot. to Dismiss at 17.  In essence, the movants argue that plaintiff has no standing to challenge the Army's evaluation of proposals precisely because it fared so poorly in that evaluation.

Yet these arguments are premised upon a misapprehension of law that is animated by confusion over the nature of the prejudice requirement in a bid protest. To that end the court now turns.

### B. Jurisdiction, Standing, Substantial Chance Doctrine and Prejudice

#### 1. In General

The authority of the Court of Federal Claims to review federal procurement decisions has rested upon a shifting jurisdictional ground. A short narrative would thus be helpful to the reader, especially because the statutory and court terminology employed is at times duplicative or redundant. This authority was originally rooted in the general provision of the Tucker Act, which grants the court "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Federal Circuit—following the lead of its predecessor, the Court of Claims—construed this jurisdictional grant to encompass suits by "disappointed bidders" alleging that the United States breached "an implied contract to have the involved bids fairly and honestly considered." *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir. 1983) (en banc); *see Keco Indus., Inc. v. United States*, 428 F.2d 1233, 1236–38 (Ct. Cl. 1970) (relying, in part, upon the seminal decision of the U.S. Court of Appeals for the D.C. Circuit in *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970)[23]); *Heyer Prods. Co. v. United States*, 140 F. Supp. 409, 412–14 (Ct. Cl. 1956).

Thereafter, Congress amended the Tucker Act by the Administrative Dispute Resolution Act ("ADRA") of 1996, Pub. L. No. 104-320, 110 Stat. 3870. Among other changes, the ADRA added subsection § 1491(b)(1), quoted above, thus displacing the implied contract theory with an explicit statutory grant of jurisdiction to adjudicate bid protest actions. Section 1491(b)(1) now provides the exclusive jurisdictional basis for the court's review of federal procurement decisions. *See Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1246 (Fed. Cir. 2010) (holding that "Congress intended the 1491(b)(1) jurisdiction to be exclusive where 1491(b)(1) provided a remedy").[24]

Atop this shifting jurisdictional ground, one landmark—namely, the requisite for establishing a disappointed offeror's standing to sue—has remained relatively fixed. *See Myers Investigative & Sec. Servs. v. United States* ("*Myers*"), 275 F.3d 1366, 1369 (Fed. Cir. 2002) (noting that "standing is a threshold jurisdictional issue," citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998)). In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or "prejudice," as a

---

[23] *Scanwell* held that the 1946 enactment of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, vested private contractors with standing to maintain—and federal courts with jurisdiction to adjudicate—challenges to federal procurement decisions, including challenges founded upon alleged statutory violations.

[24] The court's implied-contract jurisdiction, under §1491(a)(1), nevertheless survives as the basis for the court's authority to review the decisions of federal agencies in non-procurement solicitations (those in which the government is the seller or provider of the property, goods or services). *Id.*

result of the allegedly unlawful agency decisions.  *See, e.g.*, *Rex Serv. Corp.*, 448 F.3d at 1308; *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1580–81 (Fed. Cir. 1996); *Vulcan Eng'g Co. v. United States*, 16 Cl. Ct. 84, 88 (1988); *Morgan Bus. Assocs., Inc. v. United States*, 619 F.2d 892, 896 (Ct. Cl. 1980).  In turn, and regardless of the source of the court's jurisdiction, the test for prejudice has basically been invariant:[25] whether, absent the alleged errors in the procurement process, the plaintiff would have had a "substantial chance" of being awarded the contract.  *Compare ITAC*, 316 F.3d at 1319 (applying the "substantial chance" test in a protest under § 1491(b)(1)) *with CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574 (Fed. Cir. 1983) (applying the "substantial chance" test in a protest premised upon an implied-contract theory).

More specifically, prior to enactment of the ADRA—in a protest premised upon an implied contract theory—a disappointed bidder or offeror needed to demonstrate "that if its bid [or offer] had been fairly and honestly considered, there was a substantial chance that it would receive an award."  *CACI*, 719 F.2d at 1574.  *CACI* held that this denial of an otherwise substantial chance of award constitutes an "injury in fact" sufficient to establish a disappointed offeror's standing to sue.  *Id.* (citing *Assoc'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152–53 (1970)).

Thereafter, in reacting to the ADRA's adoption of the term "interested party," the Federal Circuit held that "standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed. of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("*AFGE*") (construing the phrase "interested party" in accordance with the definition provided in the Competition in Contracting Act, 31 U.S.C. § 3551(2)).  Accordingly, "to come within the Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction," a plaintiff "is required to establish that it (1) is an actual or prospective bidder [or offeror], and (2) possesses the requisite direct economic interest."  *Rex Serv. Corp.*, 448 F.3d at 1307.  In turn, to satisfy the "direct economic interest" requirement in a post-award protest, a plaintiff "must show that there was a substantial chance it would have received the contract award but for the alleged error in the procurement process."[26]  *ITAC*, 316 F.3d at 1319.  Thus, the longstanding "substantial chance rule [for prejudice] continues to apply."  *Myers*, 275 F.3d at 1370.[27]

---

[25] Two important qualifications to this statement are warranted.  First, the court's implied-contract jurisdiction extended only to "pre-award" protests, i.e., protests antedating a procuring agency's award of a contract.  *See John C. Grimberg Co.*, 702 F.2d at 1367.  Through the ADRA amendments to the Tucker Act, however, Congress expanded the court's jurisdiction to encompass all bid protests, including "post-award" protests (those filed after the award of a contract), such as the instant matter.  28 U.S.C. § 1491(b)(1); *see Impresa Construzioni Geom. Domenico Garufi v. United States* ("*Impresa*"), 238 F.3d 1324, 1332 (Fed. Cir. 2001).  Second, in a recent and somewhat ironic development, the Federal Circuit severed the "substantial chance" test from its roots, holding that the test now applies only in post-award bid protests.  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361–62 (Fed. Cir. 2009).  Henceforth, in order to prove prejudice in a pre-award bid protest, the plaintiff need only demonstrate a "non-trivial competitive injury."  *Id.*

[26] A different test applies in pre-award protests.  *See supra* note 25.

[27] It is worth noting that the "Court of Federal Claims, though an Article I court, applies the same standing requirements enforced by other Federal courts created under Article III" of the

## 2. Two Types of Prejudice Analysis

Because it is central to a plaintiff's demonstration that it is an interested party under § 1491(b)(1), this threshold showing of "prejudice (or injury) is a necessary element of standing." *Myers*, 275 F.3d at 1370. As such, prejudice is a threshold jurisdictional issue that the Federal Circuit has stressed must be reached *before* addressing the merits in a bid protest. *ITAC*, 316 F.3d at 1319; *Myers*, 275 F.3d at 1369–70; *see Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) ("Because standing is jurisdictional, lack of standing precludes a ruling on the merits."). The lawfulness of the contested agency decisions is thus wholly immaterial to this initial showing of prejudice. *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("The threshold inquiry into standing in no way depends on the merits of [a plaintiff's] contention that particular conduct is illegal."); *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 (2005) (noting that this initial examination of prejudice "does not include weighing facts and making substantive determinations on the merits"). Rather, this showing turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true. *See USFalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010) (explaining that "for purposes of standing" the court "must accept the well-pled allegations of agency error to be true"). Given this focus on a plaintiff's allegations of agency error, the court terms this standing prejudice, "allegational prejudice."[28]

---

Constitution. *Weeks Marine*, 575 F.3d at 1359; *see Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 889 (1991) (holding that Article I courts "exercise the judicial power of the United States"); *CW Gov't Travel, Inc. v. United States*, 46 Fed. Cl. 554, 557–58 (2000) (enumerating multiple grounds for enforcing the requirements of Article III standing in suits brought in the Court of Federal Claims). The "irreducible minimum" of Article III standing requires demonstration of (1) an "injury in fact" that bears (2) a "causal connection" to the conduct complained of, and which is (3) likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In a bid protest, the court's ability to redress the plaintiff's injury (the third requirement of Article III standing) is foregone, given the court's authority "to grant declaratory and injunctive relief, the remedies most sought in bid protest actions." *Impresa*, 238 F.3d at 1331. The "substantial chance" test for prejudice captures the remaining two requirements of Article III standing: "injury in fact" (denial of an otherwise substantial chance of receiving the contract award) and "causal connection" (but for the alleged errors in the procurement process). *Compare Lujan*, 504 U.S. at 560 *with ITAC*, 316 F.3d at 1319.

[28] The term "allegational" merely denotes the focus on a plaintiff's allegations of agency error and does not fix the plaintiff's evidentiary burden in demonstrating prejudice. As a central element of standing, the initial showing of prejudice "is not a mere pleading requirement 'but rather an indispensable part of the plaintiff's case'" in a bid protest. *Night Vision Corp.*, 68 Fed. Cl. at 391 (quoting *Lujan*, 504 U.S. at 561). Accordingly, it "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Allegations alone may suffice at the pleading stage, but concrete evidence is required at later stages. *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1331 (Fed. Cir. 2008). Even at the pleading stage, if facts foundational to the showing of allegational prejudice are challenged, a plaintiff must establish those facts by a preponderance of the evidence. *See Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999) ("Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged.").

In order to prevail in a bid protest, however, a plaintiff must satisfy a second type of prejudice requirement, one that has caused a good deal of confusion[29] because it is often mistaken for its standing doctrinal fraternal twin. *See USFalcon*, 92 Fed. Cl. at 450 (explaining why two examinations of prejudice are needed); *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 482 n.25 (2008) (noting that "prejudice analysis" comes in "two varieties"); *see also L-3 Global Commc'ns Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 608 n.4 (2008); *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 536 (2007); *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 769 (2006); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 285 (2006). The need for this second showing of prejudice is captured in section 10(e) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706,[30] which is incorporated in 28 U.S.C. § 1491(b)[31] as the standard of review to establish entitlement to relief in bid protest cases. *See Textron*, 74 Fed. Cl. at 284–85; *Metro. Van*

---

[29] This confusion has sometimes led the court to forego the prejudice inquiry altogether, in the belief that only "[i]f the court finds error" in the procurement process does "it then examine[] whether the error was prejudicial to plaintiff." *Info. Tech. and Applications Corp., Inc. v. United States*, 51 Fed. Cl. 340, 346 (Fed. Cl. 2001) (dismissing the protest after finding no errors in the contested procurement), *aff'd*, 316 F.3d 1312, 1319 (affirming dismissal of the protest on the merits, but holding that the Court of Federal Claims' "approach was erroneous" in failing to examine prejudice before addressing the merits). In other cases, the court has wasted judicial resources adjudicating the merits of a bid protest that the plaintiff never had standing to bring in the first instance. *E.g.*, *Myers Investigative & Sec. Servs., Inc. v. United States*, 47 Fed. Cl. 605, 620 (2000) (holding that its "plaintiff failed to prove it was prejudiced by defendant's actions" and dismissing the protest, but only after deciding the merits), *aff'd*, 275 F.3d 1366, 1371 (affirming dismissal of the protest due to the plaintiff's failure to demonstrate prejudice, but on the ground that the plaintiff thus "did not have standing").

[30] In full, section 10(e) of the APA provides as follows:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be-

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

[31] Section 1491(b) provides: "In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).

*and Storage, Inc.*, 92 Fed. Cl. at 248.   The court thus terms this second showing of prejudice, "APA prejudice."

In particular, the APA instructs that "due account shall be taken of the rule of prejudicial error" when determining whether to set aside any unlawful agency decision.  5 U.S.C. § 706; *see supra* note 30.  Concordantly, the Federal Circuit has held that the court must conduct a second prejudice inquiry—one to which the court's determination on the merits is a prerequisite—in order to "assess[] whether an adjudged violation of law warrants setting aside a contract award." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005).  To satisfy this second prejudice inquiry, a plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the errors" that the court determines the agency made.  *Id.* at 1353.

To summarize, Federal Circuit precedent has used the doctrine of prejudice in two distinct ways, the first relating to the pre-decisional standing inquiry of "allegational prejudice,"  the second corresponding to "APA prejudice."  *Compare ITAC*, 316 F.3d 1319 (explaining that "the prejudice issue must be reached *before* addressing the merits" (emphasis added)) *with Bannum*, 404 F.3d at 1351 (explaining that a "bid protest proceeds in two steps," whereby the court first decides the merits, then determines if the plaintiff was prejudiced by any adjudged violations of law).  It is interesting to note that both categories of prejudice apply the "substantial chance" test. *Compare ITAC*, 316 F.3d at 1319 *with Bannum*, 404 F.3d at 1353; *see USfalcon*, 92 Fed. Cl. at 450.

But that is not the end of our "prejudice" inquiry.  Partly to clarify the distinction between the two prejudice inquiries, bid protest jurisprudence writ large can be seen as evolving into a *three*-step analysis.  First, in order to demonstrate allegational prejudice, a plaintiff must show that it would have had a substantial chance of being awarded the contract but for the combined impact of all agency decisions *alleged* to be unlawful.  *See ITAC*, 316 F.3d at 1319; *USFalcon*, 92 Fed. Cl. at 450; *Serco*, 81 Fed. Cl. at 482 n.25; *Textron*, 74 Fed. Cl. at 285.  Second, and only if the plaintiff makes this threshold showing of prejudice, the court determines whether the challenged agency decisions were contrary to law.  *See id.*  And third, in order to demonstrate APA prejudice, the plaintiff must show that it would have had a substantial chance of being awarded the contract but for the combined impact of any agency decisions *adjudged* to be unlawful.  *See Bannum*, 404 F.3d at 1353; *USFalcon*, 92 Fed. Cl. at 450; *Serco*, 81 Fed. Cl. at 501; *Textron*, 74 Fed. Cl. at 285.

To be sure, the second prejudice inquiry (the third step in the above analysis) is not always required.  If all alleged procurement errors ultimately withstand the court's scrutiny—i.e., if the court upholds as lawful every agency decision challenged by a plaintiff—the need for a second prejudice inquiry will be obviated.  *See Bannum*, 404 F.3d at 1357; *Info. Tech. and Applications Corp.*, 51 Fed. Cl. at 357.  By the same token, if none of the challenged agency decisions survives judicial review—i.e., if all decisions alleged to be unlawful are adjudged to be so—a second prejudice inquiry would simply duplicate the first and would thus be redundant. *USFalcon*, 92 Fed. Cl. at 450.  However, where a plaintiff succeeds on the merits of some but not all of its allegations, a second examination of prejudice becomes necessary.  This is because the plaintiff's success in demonstrating allegational prejudice in such cases does not guarantee its success in demonstrating APA prejudice.  *See id.*  Specifically, the plaintiff in such cases may be able to satisfy the substantial chance test based upon the combined impact of all allegedly unlawful

agency decisions, but may fail to do so based upon the cumulatively lesser impact of those decisions that the court ultimately determines to be unlawful. *Id*.

### C. Does Plaintiff Have Standing To Sue?

With the above framework in place, the court turns to defendant and intervenor's central argument in support of their RCFC 12(b)(1) motions to dismiss. To reiterate briefly, the movants argue that plaintiff's challenges to the Army's price evaluation, under Counts 1 and 2, are untimely challenges to the terms of the Solicitation. *E.g.*, Def.'s Mot. to Dismiss at 10–11; Intervenor's Mot. to Dismiss at 18–20 (same). Accordingly, the movants argue that plaintiff has waived its right to bring either challenge and that this waiver erects a jurisdictional bar that mandates dismissal of Counts 1 and 2. *E.g.*, Def.'s Mot. to Dismiss at 10–11 (citing *Blue & Gold*, 492 F.3d at 1313); Intervenor's Mot. to Dismiss at 25–27 (same). With plaintiff's challenges to the Army's price evaluation dismissed, the movants conclude that plaintiff cannot demonstrate prejudice because it would not have a substantial chance of award even if successful in its remaining challenges. *E.g.*, Def.'s Mot. to Dismiss at 13; Intervenor's Mot. to Dismiss at 27.

### 1. The Waiver Rule Is Not a Jurisdictional Bar

Contrary to the movants' contention, however, the waiver rule of *Blue & Gold* does not erect a jurisdictional bar to plaintiff's claims. *See* Def.'s Mot. for J. at 11 n.1; Intervenor's Mot. to Dismiss at 25–27. Rather, the Federal Circuit's express ground for recognizing a waiver rule is the Tucker Act's non-jurisdictional mandate for "expeditious resolution" of bid protest actions. *Blue & Gold*, 492 F.3d at 1313 (citing 28 U.S.C. § 1491(b)(3)).

In *Blue & Gold*, the Federal Circuit began its discussion with the patent ambiguity doctrine, under which an offeror's failure to seek clarification of a patent ambiguity in a government solicitation precludes acceptance of the offeror's interpretation in any subsequent court action. *Id*. (citing *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000)). *Blue & Gold* explained that recognition of a waiver rule—with respect to challenges to patent ambiguities or patent errors in a government solicitation—vindicates the equitable principle that "[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm." *Id*. at 1314 (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005)).

*Blue & Gold* further analogized the waiver rule to the doctrines of laches and equitable estoppel. *Id*. at 1314–15 (citing, inter alia, *Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 n.5 (2004)). Of course, these equitable doctrines do not impose jurisdictional requirements, but rather create affirmative defenses that a defendant must invoke. *See, e.g.*, *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 530 (2010) (citing *Poett v. Merit Sys. Prot. Bd.*, 360 F.3d 1377, 1384 (Fed. Cir. 2004)).

The Federal Circuit concluded its analysis in *Blue & Gold* by recognizing that "the jurisdictional grant of 28 U.S.C. § 1491(b)(1) contains no time limit requiring a solicitation to be challenged before the close of bidding." *Blue & Gold*, 492 F.3d at 1315. In other words, *Blue & Gold* repudiated the possibility of tethering the waiver rule to the Tucker Act's jurisdictional

requirements.  Rather, the Federal Circuit explained that it is the statutory mandate of § 1491(b)(3) for "expeditious resolution"—a non-jurisdictional requirement—along with "the rationale underlying the patent ambiguity doctrine"—a rationale founded upon equitable considerations— that "favor recognition of a waiver rule."[32]  *Id.*

Concordantly, the Court of Federal Claims has consistently applied the waiver rule of *Blue & Gold* as part of the court's determination on the merits in a bid protest.  *E.g.*, *Moore's Cafeteria Servs. v. United States*, 77 Fed. Cl. 180, 185 (2007); *Masai Techs. Corp. v. United States*, 79 Fed. Cl. 433, 444 (2007); *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 737 (2007).  In some instances, the court has dismissed an untimely challenge to the terms of a solicitation on the ground that the challenge failed to state a claim upon which relief may be granted.  *E.g.*, *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 136–37 (2009); *Int'l Mgmt. Srvcs., Inc. v. United States*, 80 Fed. Cl. 1, 9 (2007).  Of course, dismissal for failure to state a claim is itself a decision on the merits.  *See, e.g.*, *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981).

Finally, defendant's attempt to analogize the waiver rule to the Tucker Act's statute of limitations is misguided.  *See* Hr'g Tr. at 13.[33]  The Tucker Act's statute of limitations, 28 U.S.C. § 2501, is jurisdictional because it is a condition on the United States' waiver of sovereign immunity.  *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006), *aff'd*, 552 U.S. 130 (2008); *Martinez v. United States*, 333 F.3d 1295, 1316 (Fed. Cir. 2003) (en banc).  In that regard, § 2501 is exceptional among statutes of limitations.  Like other timeliness rules, most statutes of limitations are treated as affirmative defenses that are themselves subject to waiver if not raised in a timely manner.  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008).  To be sure, failure to bring a claim within any limitations period invariably bars relief, as a practical matter.  As a matter of jurisprudence, however, this does not deprive the court of jurisdiction over the untimely claim.

In short, the waiver rule of *Blue & Gold* creates an equitable, rather than jurisdictional, bar to a disappointed offeror's untimely challenge to the terms of a government solicitation.  Thus, although the court agrees that plaintiff's challenges to the Army's price evaluation, under Counts 1 and 2, are untimely, *see infra* p. 40, this does not deprive the court of jurisdiction over those claims.  Equally important, because it is a determination on the merits, applicability of the *Blue & Gold* waiver rule has no place in the court's inquiry into allegational prejudice, the inquiry pertinent to the threshold question of plaintiff's standing.  *See ITAC*, 316 F.3d at 1319; *Myers*, 275 F.3d at 1369; *Media Techs. Licensing*, 334 F.3d at 1370.  By grounding their motions to dismiss upon operation of the waiver rule, defendant and intervenor seek to inject a merits determination into an inquiry that abides none.  *See id.*

---

[32] Defendant simply misreads this section of the opinion in *Blue & Gold* when it cites it for the proposition that the "Federal Circuit tied the waiver rule to this [c]ourt's jurisdictional statute, making clear that this rule constitutes a jurisdictional prerequisite."  Def.'s Mot. for J. at 11 n.1 (citing *Blue & Gold*, 492 F.3d at 1315).

[33] At oral argument, defendant's counsel stated: "So, in that sense, we are saying that in order to bring a claim against a solicitation, you must file within a certain time period, and this is analogous to a situation where like in the six year statute of limitations for I guess any other claim under the Tucker Act before this [c]ourt, which would be a jurisdictional issue."  *Id.*

### 2. Plaintiff Can Demonstrate Allegational Prejudice

Furthermore, beyond the issue of the applicability of the waiver rule of *Blue & Gold* to jurisdiction, the court concludes that plaintiff has readily demonstrated allegational prejudice and thus standing to sue. This is because plaintiff would have had a substantial chance of receiving the AAA contract but for the *combined* impact of the alleged errors in the Army's procurement. *See USFalcon*, 92 Fed. Cl. at 450 (explaining that a plaintiff can "cumulatively establish prejudice" through the impact of "multiple errors"); *Serco*, 81 Fed. Cl. at 501 (holding "that the combined impact of the errors encountered here clearly prejudiced each of the protesters"). As explained below, but for the challenged aspects of the Army's evaluation of price and past performance, plaintiff would have rated favorably under both of these evaluation factors and would have been well positioned to prevail in a trade-off analysis.

Under Counts 1 and 2, plaintiff posits various grounds for its allegation that the Army's price evaluation was unlawful. Am. Compl. ¶¶ 65–81; Pl.'s Mot. for J. at 33–42. Plaintiff alleges that the law required the Army to calculate Total Evaluated Price (the basis for award) as the Total Amount for all CLINs rather than as the sum of unit prices. *E.g.*, Pl.'s Mot. for J. at 34–35. Taking that allegation as true as this court must, *see supra* p. 19, had the Army hypothetically calculated Total Evaluated Price as plaintiff proposes, plaintiff's ranking in price would have leapt from a distant seventh to a fairly close second, immediately below intervenor (the awardee). *See* AR 600. And defendant misses the mark when it argues that plaintiff's "high price is not the result of the evaluation method used by the Army, but rather a business decision on the part of [plaintiff] to include an extraordinarily high unit price" for CLIN 0011. Def.'s Mot. to Dismiss at 9. Plaintiff's proposed unit prices for CLIN 0011—which totaled $[number redacted] for all four contract periods—represented a vastly disproportionate [number redacted]% of plaintiff's sum of unit prices. *See* AR 321, 600. By contrast, CLIN 0011 contributed a relatively negligible [number redacted]% of plaintiff's Total Amount for all CLINs, which was approximately $[number redacted] million. *Id*. Therefore, it appears to the court that plaintiff's poor ranking in price thus resulted, not from any business decision on plaintiff's part, but from the Army's decision to use the sum of unit prices as the basis for award.

In addition, under Count 4, plaintiff alleges that the SSA's past performance evaluation unlawfully excluded from consideration a wide range of relevant past performance information. *See, e.g.*, Am. Compl. ¶¶ 115–19; Pl.'s Mot. for J. at 24–29. Had the SSA expanded the scope of the past performance evaluation as plaintiff alleges the law required—so as to encompass purportedly negative past performance information for other offerors and positive information for plaintiff—plaintiff's ranking in past performance would have changed dramatically. *See, e.g.*, Pl.'s Mot. for J. at 24–29. Intervenor's past performance rating, in particular, would have been further reduced had the SSA included the negatively rated GLS PPQ in her evaluation, as plaintiff alleges the law required. *See, e.g.*, Pl.'s Mot. for J. at 24; Intervenor's Resp. to Pl.'s Mot. for J. ("Intervenor's Resp.") at 21–22. Indeed, had the SSA conducted the more expansive evaluation that plaintiff urges, plaintiff might well have ranked first in past performance with a rating of "Very Low Risk," while all other offerors would have been assigned a rating of "Moderate Risk" or worse. *See* Pl.'s Mot. for J. at 27, 31.

If plaintiff were thus ranked second in price and first in past performance, the SSA would have been required to include plaintiff in the trade-off analysis. *See* AR 54. As noted above, the RFP required the SSA to "conduct a trade off based on a comparative assessment of the [p]ast

[p]erformance and [p]rice factors," with the proviso that the "[p]ast [p]erformance factor is significantly more important than price." *Id*. Thus, even a modest improvement in plaintiff's ranking in past performance, along with a second-place ranking in price, would have afforded plaintiff a substantial chance of prevailing in a trade-off analysis and thus being selected for award. Accordingly, plaintiff has demonstrated allegational prejudice and has standing to sue.

Before turning to the merits, however, the court must address the movants' second argument. As noted above, defendant argues that plaintiff lacks standing because, as the seventh-ranked offeror in price and past performance, "it *never had* a 'substantial chance' of receiving award" and "*was* outside the zone of consideration." Def.'s Mot. to Dismiss at 8, 9 (emphases added). In a slight variation on this logic, intervenor attempts to limit plaintiff to demonstrating allegational prejudice based upon the incremental impact of one alleged error at a time. *See* Intervenor's Mot. to Dismiss at 17. In a sense, this argument conflates allegational prejudice with APA prejudice. By insisting that plaintiff's poor ranking precludes it from being an interested party, the movants essentially would have plaintiff prove the merits of its allegations—i.e., prove that the contested procurement decisions are unlawful—before it may rely upon the impact of those decisions in demonstrating prejudice.

More importantly, the movants misapprehend the nature of the inquiry into allegational prejudice, an inquiry aimed at assessing the plaintiff's likely prospects for the contract award, *see ITAC*, 316 F.3d at 1319, but for the combined impact of all alleged errors in the procurement, *see USFalcon*, 92 Fed. Cl. at 450. That is, plaintiff need not demonstrate that it *had* a substantial chance of award *despite* the alleged errors, but rather that it *would have* had a substantial chance of award *but for* the alleged errors. *See ITAC*, 316 F.3d at 1319; *see also Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 77–78 (2007); *Night Vision Corp.*, 68 Fed. Cl. at 392.

Indeed, to accept either defendant's or intervenor's logic would be to permit the Army, indeed any procuring agency, to insulate from judicial review much of its decision-making in a competitive acquisition. *See Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 37 (2010) (rejecting a similar argument due to its "illogical result of potentially insulating from review an agency's decision to declare one proposal acceptable and another unacceptable"). Under intervenor's view of the allegational prejudice inquiry, a procuring agency could evade judicial oversight by making a series of unfavorable determinations, each with a negligible impact on the rating of an offeror's proposal, but with the cumulative effect of excluding that offeror from the competitive range. And under defendant's view, a procuring agency could accomplish the same goal by rating a losing offeror so unfavorably on a single evaluation factor as to fling it irretrievably far from the zone of consideration. The court has previously rejected, as a "transparent and misleading attempt[] to change binding law," defendant's similar contention that an agency's decision to exclude an offeror from the competitive range precludes the offeror from establishing standing. *Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 469 (2008). Quite simply, the law cannot abide the result that either defendant or intervenor seeks.

As explained above, plaintiff can readily make the required showing of allegational prejudice because it would have had a substantial chance of being awarded the AAA contract but for the alleged errors in the Army's procurement. *See ITAC*, 316 F.3d at 1319. Plaintiff is thus an "interested party" under § 1491(b)(1) and has standing to bring the instant protest. *See id.*; *AFGE*, 258 F.3d at 1302.

# III. DISCUSSION

## A. Plaintiff's Request for Injunctive Relief

In its prayer for relief, plaintiff asks the court to "[e]nter a permanent injunction enjoining the Government from any of the actions complained of herein, including enjoining the Government's performance of the Contract." Am. Compl. at 49. Ordinarily, the court would first address the merits of plaintiff's allegations before reaching, if at all, the equitable considerations bearing upon its request for injunctive relief. After all, success on the merits is a condition precedent to granting a permanent injunction. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004) (noting that a plaintiff "must" succeed on the merits before the court may grant a permanent injunction); *Assessment and Training Solutions Consulting Corp. v. United States*, 92 Fed. Cl. 722, 737 (2010) (declining to grant a permanent injunction "because plaintiff has not succeeded on the merits of this case").

However, as the court explains below, any irreparable harm that plaintiff might suffer from the denial of injunctive relief is greatly outweighed by the public interest and the Army's interest in ensuring that the critical services provided under the AAA contract continue without interruption. Therefore, as the Supreme Court held when confronted with similar threats to the viability of military operations and the safety of our soldiers, "proper consideration of these factors alone requires denial of the requested injunctive relief," regardless of the merits of plaintiff's case. *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008); *see Yakus v. United States*, 321 U.S. 414, 441 (1944) (the Supreme Court's seminal opinion on the dominant role that the public interest must play in a court's consideration of any request for injunctive relief, explaining that the court may "go much further both to give and withhold relief in furtherance of the public interest" than it may "when only private interests are involved").

As a general matter, an "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 129 S. Ct. at 381. This established principle applies with equal force in bid protest cases. *PGBA*, 389 F.3d at 1228–29. In particular, the Federal Circuit has held that "section 1491(b)(4) . . . does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate . . . and does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award." *Id.* (affirming the Court of Federal Claims' decision to deny injunctive relief in a post-award protest despite concluding that the procuring agency committed prejudicial error).

In deciding whether to grant a permanent injunction, the court must consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). No single factor is dispositive, and "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of injunctive relief. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (discussing the standard for preliminary injunctions); *see Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987) (explaining that the "standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the

merits rather than actual success"). Rather, the court must balance all factors, weighing each against the others, in the exercise of its sound discretion. *Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 847 (Fed. Cir. 2008); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

This balancing approach is rooted in "equity practice with a background of several hundred years of history." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). "Flexibility rather than rigidity has distinguished it," making it the "instrument for nice adjustment and reconciliation between the public interest and private needs." *Id.* It is thus inherent in the court's balancing of competing public and private interests to weigh each harm or benefit based upon both its magnitude and likelihood of occurrence. Such an approach is certainly nothing new, but has a long lineage in the law dating back at least to Judge Learned Hand's famous formula for determining liability in negligence suits. *See United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2nd Cir. 1947). In *Carroll Towing*, Judge Hand set forth in symbolic form the fundamental principle that liability for negligence should attach only where the burden (B) of avoiding injury to another is less than the magnitude of the injury (L) multiplied by the probability (P) of the injury's occurrence. *Id.* Liability is thus measured along a sliding scale: the greater the injury, the less probable that injury need be in order to tip the balance in favor of the injured plaintiff, rendering defendant liable for the injury.

Courts have long since adopted this approach in the injunction context. *See, e.g., Am. Hosp. Supply Corp. v. Mueller*, 780 F.2d 589, 593–94 (7th Cir. 1986). More generally, and "[c]onsistent with equity's character, courts do not insist that litigants uniformly show a particular, predetermined quantum of probable success or injury before awarding equitable relief." *Winter*, 129 S. Ct. at 392. Rather, the greater the threatened harm to one of the parties or to the public interest, the less likely that harm needs to be (or, alternatively, the lower the quantum of evidence needed), in order to tip the balance in favor of granting or denying the injunction, and vice versa.

When engaged in this balancing, the Supreme Court has admonished courts to be "particularly cautious when contemplating relief that implicates public interests." *Salazar v. Buono*, 130 S. Ct. 1803, 1816 (2010); *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (directing courts to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction"); *Amoco Prod. Co.*, 480 U.S. at 545 (noting the "important role of the 'public interest' in the exercise of equitable discretion"). Thus the court may, and often must, "go much further both to give and withhold relief in furtherance of the public interest" than it may "when only private interests are involved." *Yakus*, 321 U.S. at 441.

Of "paramount import" is the public interest in national defense and national security. *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 521 (2003). This paramount interest is directly implicated when a procurement involves services critical to the success of military operations and to the health and safety of our servicemen and women in the field. *See, e.g., CSE Constr. Co. Inc. v. United States*, 58 Fed. Cl. 230, 263 (2003) (denying injunctive relief in light of national security concerns because "the relative harm to the government and to the public interest . . . substantially outweighs harm to the plaintiff"). And the Supreme Court has underscored the "great deference" that courts owe "to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter*, 129 S. Ct. at 377; *see North Dakota v. United States*, 495 U.S. 423, 443 (1990)

("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle.").

In *Winter*, the Supreme Court expounded at great length on how heavily the interests of national defense and national security must weigh in the court's consideration of a request for injunctive relief, and how greatly the court must defer to the military's judgment concerning the relative importance of those interests. *Winter*, 129 S. Ct. at 376–82. As the Court aptly observed, neither the Justices "nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people." *Id.* at 377 (quoting *Boumediene v. Bush*, 553 U.S. 723, 797 (2008)). In *Winter*, the Court faulted the lower courts for "fail[ing] properly to defer to senior Navy officers' specific, predictive judgments" about the impact of injunctive relief in that case. *Id.* at 378. Deferring to the credible allegations of military officials concerning the threat posed to national security, the Court held that it was an abuse of discretion to grant injunctive relief, whether preliminary or permanent, "even if plaintiffs [were] correct on the underlying merits." *Id.* at 381; *see Computer Scis. Corp. v. United States*, 51 Fed. Cl. 297, 323 (2002) (concluding that injunctive relief would be denied due to national security concerns, even if the plaintiff were to succeed on the merits).

Thus, when military and national security interests are implicated, the public interest factor gains "inflated" importance in the court's balancing of the equities. *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 656 (2003). Indeed, in such instances, the court must consider the military's interests when weighing both the public interest and the balance of hardships. *CSE Constr. Co.*, 58 Fed. Cl. at 262. And when these interests raise national security concerns, they place the weight of both the public interest and the balance of hardships firmly on defendant's side of the scale. *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 241–42 (1997); *see Cincom Sys. Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997) ("Given the importance of military preparedness to the national defense, the balance of harms tips in defendant's favor.").

Congress has codified this deference by directing the Court of Federal Claims to "give due regard to the interests of national defense and national security" when deciding bid protest cases. 28 U.S.C. § 1491(b)(3). This is a directive that the court has always been mindful to heed. *See, e.g.*, *DataPath, Inc. v. United States*, 87 Fed. Cl. 162, 166 (2009) ("Congress has recognized that, under certain circumstances, a protestor's right to contest a government procurement must give way."); *Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 403 (2008) (concluding that the "directive of § 1491(b)(3) to give 'due regard to the interests of national defense and national security . . .' militates against granting the [injunctive] relief sought"); *CSE Constr. Co.*, 58 Fed. Cl. at 263 (denying injunctive relief "in light of this court's congressional charge to give 'due regard to the interests of national defense and national security'").

These considerations loom larger still in "times of heightened security at home, as well as lethal hostilities overseas," because "the nation can ill afford any temporary, let alone permanent, weakness in national security." *Overstreet Elec. Co., Inc. v. United States*, 59 Fed. Cl. 99, 118–19 (2003), *aff'd*, 89 Fed. Appx. 741 (Fed. Cir. 2004). Therefore, the court is duty-bound to give "the most careful consideration" to the national security concerns implicated in this case, and to "err on the side of caution [given that] such vital interests are at stake." *Gentex Corp.*, 58 Fed. Cl. at 655.

As a general matter, defendant recognizes that "the public's interest is served when the integrity of the procurement system is maintained." Def.'s Mot. for J. at 40.  Nevertheless, defendant argues that "the public interest will be [better] served" in this instance by denying injunctive relief and "preventing harm to the national security and the United States forces." *Id.* The court agrees.

Defendant has proffered the sworn declarations of two military advisors, Colonel Steven R. Mount and Sergeant First Class Andrew S. Price, who have served in the Army for thirty-four years and twenty years, respectively. *See* 2d Mount Decl. ¶ 1; 1st Price Decl. ¶¶ 1–2.  Col. Mount is currently stationed in Iraq and serves as the Fire Support Coordinator for the United States' military forces there.[34]  2d Mount Decl. ¶ 1.  Until July 14, 2010, Col. Mount was the military's Senior Technical Point of Contact for the bridge contracts being performed by SOSI and plaintiff. *Id.* ¶ 2.  Sgt. Price is also stationed in Iraq and is the Contracting Officer's Representative for the two bridge contracts as well as for the AAA contract.  1st Price Decl. ¶¶ 1–2.  Sgt. Price's responsibility is to "ensure [that] the contractors provide services to the government as required in the contract in order to support military units throughout Iraq." *Id.* ¶ 1.  In their declarations, both Col. Mount and Sgt. Price underscore the essential character of the services to be provided under the AAA contract, and they describe the extensive disruptions in the provision of these services that an injunction would threaten, as well as the grave consequences of such disruptions.

First, both men point to the Army's "limited access to the Iraqi populace" and its need to rely "on feedback from Iraqi citizens in order to gauge their concerns, opinions and attitudes."  1st Price Decl. ¶ 3; 2d Mount Decl. ¶ 3.  Sgt. Price explains that the personnel employed under the AAA contract are "local national citizens [who] are culturally aware and sometimes native to the region, [and] provide information that would otherwise be impossible to collect."  1st Price Decl. ¶ 4; *see* 2d Mount Decl. ¶ 4.  These local advisors are able to gather information "by blending in with the populace and traveling throughout areas that U.S. Forces cannot go." *Id.*  "Such information could range from routine to critical information necessary for commanders to conduct bilateral operations with Iraq Security Forces," and "can help commanders determine what Iraqi citizens are thinking in order to make sound decisions." *Id.*  Critically, this "information provided by everyday Iraqi citizens has led to the avoidance of road-side bombs and other hazards to the U.S. military." *Id.*  Both Sgt. Price and Col. Mount predict that, in their professional judgment, any "[d]isruption in collecting and analyzing such information could lead to disastrous results." *Id.*

More specifically, both men explain that "the information the contractors gather can directly affect the [Army's] counter-insurgency efforts."  1st Price Decl. ¶ 5; *see* 2d Mount Decl. ¶ 5.  Both men stress that "[t]he trust garnered by these advisors has fostered relations to such an extent that local nationals have confided sensitive information to them." *Id.*  This is because "[t]he local nationals know their surroundings and can easily point out something that is not right."  1st

---

[34] "A Fire Support Coordinator establishes and supervises the activities of the Joint Fires Cell as well as plans and synchronizes non-lethal fires." *Id.*  "'Non-lethal fires' generally refers to using information to eliminate hostile targets (terrorist groups and insurgents) without using artillery weapons to kill personnel."  2d Decl. of Andrew S. Price ¶ 4 (July 20, 2010) (attached to Def.'s Resp. to Pl.'s Mot. for J.).  This can include "speaking with Iraqi community leaders to dispel enemy propaganda" or "denying the enemy information and support of the populace." *Id.*

Price Decl. ¶ 5.   In their professional judgment, Col. Mount and Sgt. Price explain that any "disruption in information gathering could prevent the [Army] from learning information critical to engaging in counterinsurgency efforts and put [the] safety of [Army] personnel in jeopardy." *Id.*; *see* 2d Mount Decl. ¶ 5.   Both men explain that a delay or disruption in contract performance would also lead to a "loss of local national contacts," which would "reduce the [Army's] ability to collect the information necessary to track terrorists down."   *Id.*

In turn, both men predict that granting injunctive relief in the instant case could lead to just such disruptions.   As Sgt. Price explains, "due to the unknown environment that has been created as a result of delaying implementation of the [AAA] contract, and as [the bridge] contracts wind down, . . . experienced employees who are currently in Iraq may pursue other more permanent positions in Iraq, or leave the country altogether."   1st Price Decl. ¶ 7.   Indeed, this has already happened.   Between June 2, 2010 and July 11, 2010, "13 SOSI employees [] resigned, many of them formerly in atmospheric analyst positions," and a "few key personnel [] left" plaintiff's employ; these "positions remain vacant."   2d Mount Decl. ¶ 7.   As a result of this loss of personnel, "[f]or a ten day period in mid-June, [the Army] experienced a one to two day delay of information flow due to a lack of personnel to process and disseminate reports."   1st Price Decl. ¶ 7.

Both Col. Mount and Sgt. Price further predict that any delay in the start of intervenor's performance, or any disruptions in that performance, could lead intervenor to have "difficulty obtaining talented individuals to perform the services under the contract because it would require relocation to Iraq for a short period of time."   2d Mount Decl. ¶ 8; 1st Price Decl. ¶ 8.   By the same token, intervenor would also have "difficulty obtaining in-country employees because, as time passes, these individuals may seek out a more lengthy employment."   *Id.*

Faced with these credible and detailed allegations concerning the threat to the Army's operations and to the safety of our soldiers in Iraq, the court must defer to the professional judgments of Col. Mount and Sgt. Price.   *See Winter*, 129 S. Ct. at 378.   Considering the sworn declarations of these two military advisors, it is plainly clear that enjoining intervenor's performance under the AAA contract would threaten grave consequences, potentially undermining the Army's counterinsurgency operations and even leading to loss of life among our men and women in uniform.   Indeed, it is reasonable for the court to assume that because of the expected withdrawal of American troops from Iraq at the end of 2011, any delay in the performance of the contract caused by the granting of an injunction would engender instability hindering the hiring of specialized employees.   Time is of the essence in this case—the closer the pull-out date gets, the harder it will be to hire and retain personnel for ever shortening periods of contract performance.

During the course of this litigation, plaintiff challenged the sufficiency of Col. Mount's and Sgt. Price's declarations.   *See* Pl.'s Mot. to Strike Decls. at 9.   Plaintiff moved to strike both declarations on the ground that they are speculative and not based upon sufficient personal knowledge.   *Id.*   The court denied that motion after concluding that "the declarants establish sufficient personal knowledge, qualifications, and experience to provide a proper foundation" for the declarations.   Order Memorializing Conference (July 26, 2010), ECF No. 59.   As the Supreme Court responded to a similar argument in *Winter*, it "is almost always the case when a plaintiff seeks injunctive relief to alter a defendant's conduct" that the threatened harm is in some form

"speculative," because the defendant—the Army here (the Navy in *Winter*)—would be operating under changed circumstances. *Winter*, 129 S. Ct. at 378.

Moreover, given the critical nature of the services to be provided under the AAA contract, gauging the risk of any disruptions in performance involves "complex, subtle, and professional decisions" that are "essentially professional military judgments." *Winter*, 129 S. Ct. at 377 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). These are judgments that neither the court nor plaintiff has the knowledge or expertise to second-guess. Finally, given the magnitude of the threatened harm, including the potential loss of life, even a small chance of harm is sufficient to tip the scale heavily against the grant of injunctive relief. In the final analysis, the public interest in national defense and national security weighs heavily against the grant of a permanent injunction in this case: to the Army's urgent and critical needs, plaintiff's right to contest the instant procurement must yield, even if plaintiff were to succeed on the merits.[35]

The court's decision to deny plaintiff's request for injunctive relief does not, however, obviate the need to address the merits of plaintiff's allegations. Rather, success on the merits might still entitle plaintiff to relief in the form of bid preparation costs. *See* 28 U.S.C. § 1491(b)(2). Having established standing, plaintiff is thus entitled to have the court decide the merits of its protest. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.").

## B. Standard of Review

In order to succeed on the merits, the plaintiff in a bid protest must show that the challenged agency conduct or decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (incorporated by reference in 28 U.S.C. § 1491(b)(4)); *see Impresa*, 238 F.3d at 1332. The Federal Circuit has distilled this standard of review to the twofold inquiry of whether the challenged conduct or decision (1) lacked a rational basis, or (2) involved a violation of statute or regulation. *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004); *Impresa*, 238 F.3d at 1332.

Accordingly, the court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1332–33. The agency need only articulate a "rational connection between the facts found and the choice made," and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983). The disappointed offeror thus "bears a

---

[35] These same concerns led the court to deny plaintiff's motion for a preliminary injunction. *See* Hr'g Tr. at 177 (explaining that the court was "deeply concerned about harm to the public, harm to the United States, harm to our military in Iraq, so applying the sliding scale, that would be enough to deny [a] preliminary [injunction]"), 181 ("The preliminary injunction is denied. Failure to show [likelihood] of success on the merits and because of the concern I have over public [harm,] which is my greatest concern. That's enough to deny the preliminary injunction. That is enough . . . .").

heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. *Impresa*, 238 F.3d at 1333. Indeed, such a challenge can succeed only if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (citing *State Farm*, 463 U.S. at 43). Beyond this, the court must determine whether the procuring agency otherwise committed "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333.

This is a highly deferential standard of review, through which the "court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park*, 401 U.S. at 416. This is doubly true in the context of a negotiated procurement, in which agency officials must engage in an "inherently [] judgmental process," *Burroughs Corp. v. United States*, 617 F.2d 590, 598 (Ct. Cl. 1980), and are thus entrusted with "especially great discretion, extending even to [their] application of procurement regulations," *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed. Cir. 2002). Greater yet is a procurement official's discretion in awarding a contract on the basis of a best value determination rather than price alone. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). So, when challenging the technical or past performance evaluation in a negotiated procurement, a plaintiff faces the above "triple whammy of deference" to which the procuring agency is entitled. *Overstreet Elec. Co.*, 59 Fed. Cl. at 117. And, as courts have repeatedly observed, the greater the discretion entrusted to the procurement official by applicable statutes and regulations, the higher the threshold for finding the official's decision irrational or otherwise unlawful. *See, e.g., Galen Med. Assocs.*, 369 F.3d at 1330; *Burroughs Corp.*, 617 F.2d at 597; *Cygnus Corp., Inc. v. United States*, 72 Fed. Cl. 380, 384–85 (2006).

### C. A Roadmap

In short, when seeking to set aside the contract award in a best value, negotiated procurement, a disappointed offeror bears an extraordinarily heavy burden. Undeterred, plaintiff's instant complaint alleges error in virtually every aspect of the Army's evaluation of proposals. Addressing these arguments necessitates a somewhat lengthy discussion; so, the court begins with a brief outline.

The court first addresses Counts 1 and 2 jointly; these two counts recite plaintiff's challenges to the Army's price evaluation. *See* Am. Compl. ¶¶ 65–81. The court concludes that the Army evaluated price in strict accordance with the terms of the Solicitation, and that plaintiff's objections thus amount to allegations of a patent error and a patent ambiguity in the Solicitation itself. Because plaintiff failed to raise these objections with the Army in a timely manner, plaintiff has waived its right to do so in the instant protest. *See Blue & Gold*, 492 F.3d at 1313–15. Moreover, the court concludes that the Army's price evaluation was lawful and would thus remain undisturbed even if it were susceptible to plaintiff's challenge at this late date.

Next, the court addresses Count 3, which recites plaintiff's allegation that the Army granted intervenor favorable treatment by engaging in exclusive "discussions" that permitted intervenor to revise its proposal. *See* Am. Compl. ¶¶ 83–88. The court concludes that intervenor did not revise its proposal, and that the Army's limited contact with intervenor did not constitute a

"discussion," but was a mere "clarification," as those two exchanges are defined in the FAR. *See* FAR 15.306; *ITAC*, 316 F.3d at 1315, 1320–23. And because a procuring agency has the discretion to seek clarification from only one or some offerors but not others, the court concludes that intervenor did not receive favorable treatment. *See ITAC*, 316 F.3d at 1318; *DynCorp Int'l LLC*, 76 Fed. Cl. at 540. The Army lawfully exercised its right, as expressly reserved in the RFP, AR 53, to award the AAA contract without negotiations or discussions with any offeror.

The court then turns to plaintiff's challenge to the SSA's past performance evaluation, under Count 4. *See* Am. Compl. ¶¶ 90–119. Plaintiff's primary allegations are that the SSA (1) unlawfully excluded the negatively rated GLS PPQ from her evaluation of intervenor's past performance, and (2) failed to consider a wide range of additional and purportedly relevant past performance information for all offerors. *See* Pl.'s Mot. for J. at 8–32; Pl.'s Resp. at 1–10. Notwithstanding the forty pages of briefing that plaintiff dedicates to Count 4 alone, the court concludes that the SSA evaluated offerors' past performance in full compliance with the requirements of the FAR and the specifications in the RFP, and that the SSA otherwise reasonably exercised her considerable discretion in this matter.

Having dispensed with Counts 1–4, the court does not reach the merits of plaintiff's remaining allegations. Under Counts 5 and 6, plaintiff challenges the SSA's trade-off analysis and the Army's technical evaluation of intervenor's proposal, respectively. *See* Am. Compl. ¶¶ 120–38. As explained below, plaintiff could not demonstrate APA prejudice based upon the combined impact of these two alleged errors and thus would not be entitled to the award of bid preparation costs even if it were to prevail on the merits of both Counts.

### D. Plaintiff's Challenges to the Price Evaluation

Risking redundancy, for the reader's convenience, the court repeats that under Count 1, plaintiff alleges that the Army's price evaluation was unlawful because (1) it departed from the terms of the Solicitation and (2) failed to give meaningful consideration to the actual cost that the Army would incur for the AAA contract. Am. Compl. ¶¶ 66–70 (citing 10 U.S.C. § 2305(a)(3)(A)(ii), FAR 15.305(a), FAR 15.304(c)(l), FAR 15.402, FAR 15.405(b)). Under Count 2, plaintiff alleges, in the alternative, that the Solicitation was latently ambiguous as to how the Army intended to evaluate price. Am. Compl. ¶¶ 73–81. The target of plaintiff's allegations under both Counts is the Army's method for calculating Total Evaluated Price (the basis for award). Pl.'s Mot. for J. at 33–42; Pl.'s Resp. at 10–18; *see* AR 618, 2101–04.

The Army calculated Total Evaluated Price for each offeror as the sum of unit prices—more specifically, as the sum of unit prices for all contract periods (the base period and three option periods) and all CLINs (except CLINs 0008 and 0009, *see supra* notes 3, 18). AR 618, 2101–04. Plaintiff contends that the Solicitation instead required the Army to calculate Total Evaluated Price as the sum of "extended prices." Pl.'s Mot. for J. at 34–35. Plaintiff defines the "extended price" for each CLIN as the product of the unit price, the estimated quantity (as provided in the price matrix), and the number of work days per contract period. *Id.* In other words, plaintiff argues that the Solicitation equated Total Evaluated Price with the Total Amount for all CLINs. *See* AR 106 (defining Total Amount for each CLIN as "the addition of all Unit Prices Proposed multiplied by Columns C [Estimated Quantity] and D [Number of Estimated Work Days])").

Based upon this interpretation of the Solicitation, plaintiff argues that the Army's method for calculating Total Evaluated Price violated the FAR's mandate that a procuring "agency shall evaluate competitive proposals . . . solely on the factors and subfactors specified in the solicitation." Pl.'s Mot. for J. at 33–36 (quoting FAR 15.305(a)); Pl.'s Resp. at 10–16. Plaintiff further argues that, by relying upon the sum of unit prices as the basis for award, the Army failed to give meaningful consideration to the true cost of the AAA contract, in violation of statutory and regulatory requirements. Pl.'s Mot. for J. at 36–38 (citing, inter alia, 10 U.S.C. § 2305(a)(3)(A)(ii) and FAR 15.304(c)(l)).

Alternatively, plaintiff alleges that the Solicitation was ambiguous as to how the Army intended to calculate Total Evaluated Price, whether as the sum of unit prices or as the sum of extended prices. Pl.'s Mot. for J. at 38–42. Plaintiff argues that the Solicitation was susceptible to either interpretation and thus suffered from a latent (or hidden) ambiguity that must "be read against the Government as drafter of the Solicitation." Pl.'s Mot. for J. at 39; *see id.* at 38–42; Pl.'s Resp. at 16–18. That is, plaintiff urges the court to adopt plaintiff's interpretation of how Total Evaluated Price was to be calculated. *Id.*

In response, defendant and intervenor renew their argument—initially made in support of their jurisdictional motions to dismiss—that plaintiff's allegations of error in the Army's price evaluation constitute an untimely challenge to the terms of the Solicitation and are thus waived. Def.'s Mot. for J. at 10–16 (citing *Blue & Gold*, 492 F.3d at 1313); *see* Intervenor's Mot. for J. at 11–13. Specifically, defendant and intervenor assert that the Army calculated Total Evaluated Price in strict accordance with the terms of the Solicitation, which unambiguously defined Total Evaluated Price as the sum of unit prices. Def.'s Mot. for J. at 10–15 (citing AR 55–56); Intervenor's Mot. for J. at 11–12 (same). Thus, both argue that plaintiff is alleging a patent error in the Solicitation itself. *Id.* Similarly, defendant and intervenor contend that plaintiff has at most identified a patent ambiguity in the form of a facial inconsistency between the price matrix and the plain language of Section M of the RFP. Def.'s Mot. for J. at 15–16; Intervenor's Mot. for J. at 13.

The parties' arguments thus turn, as an initial matter, on proper interpretation of the terms of the Solicitation. Interpretation of an agency's solicitation is a question of law for the court. *Banknote Corp. of Am.*, 365 F.3d at 1353. And the court must address this question within the boundaries of well-settled principles of contract interpretation, principles that apply with equal force to the interpretation of government solicitations. *Id.* (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997–98 (Fed. Cir. 1996)).

**1. Governing Principles of Interpretation**

These principles require the court to begin with the plain language of an agency's solicitation. *Banknote Corp. of Am.*, 365 F.3d at 1353. Unless it is manifest that another meaning was intended and understood by all parties, the text of the solicitation must be accorded its plain and ordinary meaning. *Id.*; *ACE Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007); *see Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc); *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998).

Equally important, the court "must interpret the [solicitation] as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (quoting *United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997)); *see generally* 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:5 (4th ed. 1999). An "interpretation that gives meaning to all parts of the [solicitation] is to be preferred over one that leaves a portion of the [solicitation] useless, inexplicable, void, or superfluous." *NVT Techs. Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). Context thus defines the meaning of any given term or provision in a government solicitation. *See Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999).

Divergence between the parties' subjective interpretations does not, by itself, render a solicitation ambiguous. *Metric Constructors*, 169 F.3d at 751; *see States Roofing Corp. v. Winter*, 587 F.3d 1364, 1369 (Fed. Cir. 2009). Rather, "both interpretations must fall within a zone of reasonableness." *Metric Constructors*, 169 F.3d at 751. And the court must determine "whether the solicitation," when read as a whole, "plainly supports only one reading or supports more than one reading and is ambiguous." *NVT Techs.*, 370 F.3d at 1159; *see Gardiner, Kamya & Assocs.*, 467 F.3d at 1353; *Banknote Corp. of Am.*, 365 F.3d at 1353. In other words, the court employs an objective "reasonable offeror" standard in determining if a solicitation is ambiguous. *See id.*

If the court concludes that ambiguity exists, the court must then determine whether the ambiguity is latent or patent. *Metric Constructors*, 169 F.3d at 751 (citing *Newsom v. United States*, 676 F.2d 647, 649–50 (Ct. Cl. 1982)). An ambiguity is latent if it is not apparent on the face of the solicitation and is not discoverable through reasonable or customary care. *Input/Output Tech. Inc. v. United States*, 44 Fed. Cl. 65, 72 n.10 (1999). Under the rule of *contra proferentem*,[36] a latent ambiguity is resolved against the government as drafter of the solicitation. *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1342 (Fed. Cir. 2004). *Contra proferentem*, however, is a "rule of last resort." *Gardiner, Kamya & Assocs.*, 467 F.3d at 1352. The rule applies only if there is a genuine ambiguity that remains unresolved after the court examines the entire solicitation and all contemporaneous circumstances. *See id.*

In contrast to a latent ambiguity, a patent ambiguity in a solicitation is one that is "obvious, gross, [or] glaring." *NVT Techs.*, 370 F.3d at 1162. Such patent ambiguity may take the form of "facially inconsistent provisions" that would "place a reasonable [offeror] on notice" of a conflict or discrepancy. *Stratos Mobile Networks*, 213 F.3d at 1381. And the patency of an ambiguity is not determined by an offeror's actual knowledge, but rather by what a reasonable offeror would have perceived. *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1999). When a solicitation contains a patent ambiguity, the offeror has "a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation" in a subsequent court action. *Blue & Gold*, 492 F.3d at 1313 (quoting *Stratos Mobile Networks*, 213 F.3d at 1381). A patent ambiguity is thus an exception to the general rule of *contra proferentem* and requires the court to resolve the ambiguity against the offeror, i.e., to adopt the government's interpretation. *Id.*

---

[36] The Latin phrase "*contra proferentem*" literally means "against the offeror." Black's Law Dictionary 377 (9th ed. 2009).

Finally, if a solicitation term is susceptible to two interpretations one of which would render the solicitation unlawful, "preference will be given to that [interpretation] which does not result in violation of law." *N. Ry. Co. v. Delmar Co.*, 283 U.S. 686, 691 (1931); *see Cole v. Burns Int'l Sec. Srvcs.*, 105 F.3d 1465, 1485 (D.C. Cir. 1997); 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:11 (4th ed. 1999). This principle, however, presupposes that a genuine ambiguity exists; otherwise, the plain meaning of the text controls. *See ACE Constructors*, 499 F.3d at 1361. In other words, the court may not engage in strained or twisted analysis solely for the purpose of avoiding an unlawful interpretation. *ITT Arctic Srvcs. v. United States*, 524 F.2d 680, 684 (Ct. Cl. 1975); *see Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 645 (2004).

## 2. The Terms of the Solicitation Were Clear and Unambiguous

Guided by these fundamental principles, the court concludes that the Army calculated Total Evaluated Price—and conducted the overall price evaluation—in strict accordance with the clear and unambiguous terms of the Solicitation. The court begins by repeating some key language from the RFP. The opening section of the RFP warned offerors to "read the Evaluation [F]actors for [A]ward section [Section M] in its entirety, very carefully." AR 2 (underlining in original). In turn, Section M specified how Total Evaluated Price would be calculated. AR 55–56. Section M provided that "[t]he total sum of all proposed unit prices for all CLINs for the base and ALL option periods will be the basis for determining the Total Evaluated Price." *Id.* The immediately preceding sentence informed offerors that the "basis of award" will be this "Total Evaluated Price of the base period and three (3) six-month evaluated option periods." AR 55.

Section M also informed offerors that the Army's price evaluation would include a "balanced pricing" analysis. *Id.* In particular, Section M explained that "[u]nbalanced pricing exists when the price of one or more contract line items is significantly over or understated." *Id.* Highlighting the significance of the balanced pricing analysis, the RFP warned offerors that the Army may reject any proposal that shows unbalanced pricing if this "poses an unacceptable risk to the Government." *Id.*

In turn, the information provided in the price matrix corresponded perfectly to the specifications and instructions in Section M. First, the price matrix reproduced nearly verbatim the language from Section M that defined Total Evaluated Price. *Compare* AR 106 *with* AR 55–56. Specifically, the following text appeared in the bottom row of the price matrix: "TOTAL EVALUATED PRICE: (This number will be calculated by adding up the UNIT prices for ALL CLINS and ALL Base and Option Periods)." AR 106. Second, consistently with the provision in Section M for balanced pricing analysis, the price matrix defined a second price measure, Total Amount. *See* AR 106. As described above, the price matrix contained embedded mathematical formulae that automatically calculated the Total Amount for each CLIN and, in the bottom cell of the column (Cell J14), the Total Amount for *all* CLINs. *See* AR 106, 2101.

Looking at the Solicitation as a whole, in a manner that avoids conflict or surplusage, the court concludes that the Solicitation is susceptible to only one reasonable interpretation. *See ACE Constructors*, 499 F.3d at 1361; *Gardiner, Kamya & Assocs.*, 467 F.3d at 1353. As to the text of the Solicitation, the court cannot fathom how either of the two key phrases—"total sum of all proposed unit prices," AR 55 (Section M), and "[t]his number will be calculated by adding up the

UNIT prices," AR 106 (price matrix)—could have been any clearer or more precise.  Certainly, the plain and ordinary meaning of the words "sum" and "adding up" is not susceptible to debate. And the Solicitation unambiguously defined "unit price" as the price "[p]er [d]ay [p]er [p]osition." AR 106.

At no point during the course of this litigation did plaintiff explain how the Solicitation could have expressed more precisely the Army's intent to calculate Total Evaluated Price as the sum of unit prices.  In this regard, it is useful to view the Solicitation's language as a point along a spectrum that ranges from perfect clarity to patent ambiguity.  *See Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed. Cir. 1988) ("When determining whether contract language is patently ambiguous, the language must be placed at a point along a spectrum of ambiguity."). At one end of the spectrum, the meaning is perfectly clear and any additional detail would amount to worthless surplusage; at the opposite end, the meaning is patently ambiguous (or even vague) and additional language is manifestly required in order to resolve the ambiguity (or vagueness). *See id.*  Here, any additional language in the Solicitation's definition for Total Evaluated Price—as that definition appeared in both Section M and the price matrix—would have been worthless surplusage.

As to context, the two unambiguous and synonymous phrases defining Total Evaluated Price appeared in the two most important parts of the Solicitation: Section M, which set forth the evaluation factors for award, and the price matrix, which offerors were told would be incorporated into the awardee's contract.  *See* AR 49, 55–56, 106.  Moreover, the interpretation that plaintiff advances is one that equates Total Evaluated Price with the Total Amount for all CLINs. *Compare* Pl.'s Mot. for J. at 34–35 (defining "extended prices") *with* AR 106 (defining Total Amount).  Yet the Solicitation provided two irreconcilable definitions for these distinct price metrics.  *Compare* AR 55–56 *with* AR 106.  Accordingly, to accept plaintiff's interpretation would be to embrace, rather than avoid, a glaring conflict in the Solicitation.

In short, the plain language of the Solicitation, in both Section M and in the price matrix, was susceptible to only one reasonable interpretation, that of the Army.  Offerors' proposed prices were to be ranked based upon Total Evaluated Price, which was to be calculated as the sum of unit prices, not as the sum of extended prices.  *See* AR 55–56, 106.  This is the only interpretation that avoids surplusage and conflict in the Solicitation and accords the text its plain meaning.  The Army thus calculated Total Evaluated Price exactly as the Solicitation instructed.  *See* AR 617–19, 2101–04.

### 3. Plaintiff's Interpretation of the Solicitation Is Not Reasonable

In attempting to demonstrate the reasonableness of its competing interpretation, plaintiff relies upon a hyper-technical parsing of words, a strained reading of the plain language of the Solicitation, and a fabricated need to "harmonize" the language of the RFP with the price matrix. *See* Pl.'s Resp. at 13.  First, plaintiff insists, without basis, that the term "CLIN" necessarily "means services, price and quantities."  *Id.*[37]  As defendant rightly points out, however, the term

---

[37] In support of this definition for the term "CLIN," plaintiff cites the Acquisition Process Guide of the National Oceanic and Atmospheric Administration.  *See* Pl.'s Resp. at 13.  The court can only guess what is the relevance of this citation.

CLIN simply referred to the particular service to be performed under the AAA contract, primarily, the personnel position to be filled. *See* AR 5–7, 140–41; Def.'s Mot. for J. at 12. Moreover, each CLIN was listed in the RFP without any specified quantities. *See* AR 5–7, 140–41.

Next, plaintiff points to the RFP's specification that the sum of unit prices "will be the basis for determining"—rather than "is"—Total Evaluated Price. Pl.'s Resp. at 14. As the court is able to glean, plaintiff's point is that the phrase "basis for determining" is somehow less definitive than the word "is." *See id.* Plaintiff argues that this phrase left undefined the precise calculation method (whether addition, multiplication, or some combination thereof) through which unit prices would be used to arrive at Total Evaluated Price. *See id.* Yet plaintiff quotes the phrase out of context, ignoring the immediately preceding clause that did define the price calculation method to be used: the "sum of all proposed unit prices." AR 55–56. The court thus sees no merit in plaintiff's hair-splitting distinction between the word "is" and the phrase "basis for determining."

Finally, because the price matrix did not include an embedded formula that calculated the sum of unit prices, plaintiff argues that the Army's use of this measure for calculating Total Evaluated Price rendered the price matrix "meaningless." Pl.'s Mot. for J. at 35; Pl.'s Resp. at 15. Plaintiff insists that Total Evaluated Price must be equated with the only embedded formula in the price matrix that calculated a price encompassing all CLINs: this was the formula in Cell J14, which calculated the Total Amount for all CLINs. Pl.'s Resp. at 15; *see* AR 106, 2101. For example, plaintiff points to language in the price matrix providing that estimated quantities would be used "for evaluation purposes!" Pl.'s Mot. for J. at 41–42. Plaintiff posits that "this language suggested that the estimated quantities for each CLIN would be used in calculating the Total Evaluated Price." *Id.* at 42. Otherwise, plaintiff puzzles, "[w]hy include the [p]rice [m]atrix in the first place?" and "[w]hat was the purpose of the [p]rice [m]atrix and the weighted quantities for each CLIN?" Pl.'s Resp. at 15.

Of course, the answer to plaintiff's question is plain: the purpose of the estimated quantities was to permit the Army to conduct the balanced pricing analysis that Section M of the RFP required. *See* AR 55, 617. Specifically, estimated quantities were used to calculate the Total Amount for all CLINs. *See* AR 106. In turn, as described above, the FSB's balanced pricing analysis involved a comparison between offerors' ranking according to Total Evaluated Price, on the one hand, and their alternative ranking according to the Total Amount for all CLINs, on the other hand. AR 617. In other words, the Army did use the estimated quantities "for evaluation purposes," AR 106, as the Solicitation promised. Additionally, the price matrix forced all offerors to submit their proposed prices in a uniform format that greatly facilitated the second component of the FSB's balanced pricing analysis, which "consisted of a visual scan of the unit prices submitted." AR 617.

In any case, the court need not strive to correct every contortion of logic and language that plaintiff has attempted in order to support its position. Quite simply, Total Amount, which sub-served the balanced pricing analysis, and Total Evaluated Price, which was the basis for award, were two distinct price metrics that served manifestly different purposes. And it is of no moment that a lone FSB analyst initially perceived a "discrepancy" between the RFP and the price matrix—based upon less than a careful reading of both documents—as to whether Total Evaluated Price or Total Amount was to be the basis for award. *See* AR 618, 620. Both the contract specialist and the SSA reviewed the purported "discrepancy" and concluded that none existed

because "the language on the [p]rice matrix for Total Evaluated Price determination was in agreement with the language used in Section M" of the RFP. AR 620. The court agrees.

Turning to plaintiff's alternative allegation that the Solicitation was latently ambiguous, the court finds a series of equally meritless arguments. First, plaintiff points to the fact that its Chief Operating Officer interpreted the Solicitation to mean that Total Evaluated Price would be calculated as the sum of extended prices. Pl.'s Mot. for J. at 40. Plaintiff contrasts its Chief Operating Officer's interpretation with that of the Army and proffers the sheer existence of these divergent interpretations as evidence that the Solicitation was ambiguous. *Id.* Of course, the fact that the parties differ in their subjective interpretations does not create an ambiguity: genuine ambiguity exists only if the competing interpretations fall within an objective "zone of reasonableness." *Metric Constructors*, 169 F.3d at 751. The conviction of plaintiff's Chief Operating Officer that his interpretation is the correct one, *see* Pl.'s Mot. for J. at 40, however deep that conviction may be, does not render his interpretation reasonable. And, as the court has already explained, the plain and unambiguous language of the Solicitation, as it appeared in both the price matrix and Section M of the RFP, was susceptible to only one reasonable interpretation, that of the Army.

Incredibly, plaintiff contends that "there is nothing in the Solicitation that expressly states that the sum of extended prices *would not* be used in the evaluation of prices." Pl.'s Mot. for J. at 41 (emphasis in original); *see* Pl.'s Resp. at 18. Plaintiff goes on to explain that its true "complaint is that the Government should have used both methods"—referring to the sum of unit prices and the sum of extended prices—"because the Solicitation permitted the Government to use both methods." Pl.'s Mot. for J. at 41. Of course, the Army did use both methods. As noted repeatedly above, the Army compared the sum of extended prices, i.e., the Total Amount for all CLINs, to the sum of unit prices, i.e., Total Evaluated Price, in order to check for unbalanced pricing in offerors' proposals. *See* AR 55, 617.

More to the point, if plaintiff means that the Solicitation permitted the Army to use both methods to rank offerors for the purpose of award, plaintiff's contention is utterly without merit. The only language that plaintiff cites in support of its argument is a completely inapposite excerpt describing the techniques to be used for assessing price reasonableness, not the calculation of Total Evaluated Price or the selection of an awardee. *See* Pl.'s Mot. for J. at 41 (citing AR 55, ¶ C.2). More generally, plaintiff's apparent premise—that a procuring agency is permitted to employ any evaluation method that a solicitation does not expressly proscribe, *see id.*—runs afoul of the FAR's mandate that "[a]n agency *shall* evaluate competitive proposals . . . *solely* on the factors and subfactors specified in the solicitation." FAR 15.305(a) (emphasis added). To adopt plaintiff's position would be to reduce all affirmative terms in a government solicitation to a mere sliver of the universe of evaluation criteria that a procuring agency may employ. This would render a nullity much of procurement law and would do far more to "prevent offerors from competing intelligently," *see* Pl.'s Mot. for J. at 39, than could any of the alleged errors that plaintiff asserts in this protest. Here, the Solicitation unequivocally set forth a single, mandatory, and exclusive method for calculating Total Evaluated Price. *See* AR 55–56. Contrary to plaintiff's baseless assertion, the Army was not free to choose an alternative or complimentary basis for award.

Finally, the court notes that the only conceivable source of ambiguity in the Solicitation lay in the structure of the price matrix, not in the language of the RFP as plaintiff has insisted. On the one hand, the unambiguous verbal definition for Total Evaluated Price (the sum of unit prices) appeared in Row 14 of the price matrix. *See* Appendix B; AR 106. On the other hand, the equally unambiguous definition for Total Amount (the sum of extended prices) appeared at the top of Column J of the price matrix. *See id*. At the intersection of Column J and Row 14 lay Cell J14, which contained the embedded formula that automatically calculated the Total Amount for all CLINs (i.e., the sum of extended prices for all CLINs). *See id*. This arguably created ambiguity within the price matrix itself as to which price metric—Total Amount or Total Evaluated Price— the formula in Cell J14 was intended to calculate. *See id*. This is presumably what led the FSB analyst, Steven Talbert, to perceive a "discrepancy" or "conflict" between Section M of the RFP and the price matrix. *See* AR 618, 620. This, of course, could not be a latent defect that somehow emerged only after the Army conducted its price evaluation, as plaintiff urges. *See* Pl.'s Mot. for J. at 41; Pl.'s Resp. at 18. Rather, this at best was a facial inconsistency created by the spatial layout of the price matrix, i.e., a hypothetical patent, not latent, ambiguity. *See Stratos Mobile Networks*, 213 F.3d at 1381; *NVT Techs.*, 370 F.3d at 1162.

### 4. Plaintiff Has Waived Its Right To Challenge the Army's Price Evaluation

In sum, plaintiff's challenges to the Army's price evaluation, under Counts 1 and 2, amount to allegations of a patent error and a patent ambiguity in the Solicitation, respectively. Having failed to raise these objections with the Army prior to submitting its proposal, plaintiff has waived its right to do so before this court. *See Blue & Gold*, 492 F.3d at 1313; *Unisys Corp.*, 89 Fed. Cl. at 137. The "waiver rule" governing challenges to the terms of a government solicitation is unqualified: *Blue & Gold* held that its plaintiff-appellant had waived its right to challenge a solicitation term, even though the term in question was concededly unlawful. 492 F.3d at 1316. Accordingly, the Army's method for calculating Total Evaluated Price, along with the Army's use of this measure as the exclusive basis for award, must stand undisturbed even if it were unlawful.

Moreover, the court can discern nothing unlawful in the Army's price evaluation. In its allegation to the contrary, plaintiff argues that the Army's reliance upon the sum of unit prices, rather than the sum of extended prices, failed to give meaningful consideration to the actual cost that the Army would incur for the AAA contract. Pl.'s Mot. for J. at 36–38. In support of this argument, plaintiff points primarily to the FAR's general mandate that "[p]rice or cost to the Government shall be evaluated in every source selection." Pl.'s Mot. for J. at 37 (quoting FAR 15.304(c)(1)).

Yet conspicuously absent from FAR 15.304(c)(1), and from other FAR and statutory provisions, is any language that constrains or even addresses the precise method that a procuring agency must use in evaluating either price or cost. *See, e.g.*, FAR 15.402 ("Contracting officers shall – (a) Purchase supplies and services from responsible sources at fair and reasonable prices"); 10 U.S.C. § 2305 (a)(3)(A)(ii) (providing that a procuring agency "shall include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals"). For example, in its guidance to procuring agencies concerning price negotiation with a prospective contractor, FAR 15.405(b) provides that the "contracting officer's primary concern is the overall price the Government will actually pay." Against the backdrop of this basic tenet, however, FAR 15.405(b) advises that "the contracting officer should not become preoccupied with

any single element and should balance the contract type, cost, and profit or fee negotiated to achieve a total result—a price that is fair and reasonable to both the Government and the contractor."

In a solicitation for an IDIQ contract, where an agency's needs are indeterminate at the time of contracting, a comparative price evaluation of competing proposals presents a particular challenge. Indeed, the issue—namely, the methods that a procuring agency may lawfully employ to evaluate and compare the prices of competing proposals for an IDIQ contract—is one of first impression for the court.[38]

To be sure, the Comptroller General has formed a decided opinion on the matter and has repudiated reliance upon unit prices alone when evaluating proposals for IDIQ contracts. *E.g.*, *West Coast Copy*, B-254044, 93-2 CPD ¶ 283, at \*5 (Comp. Gen. Nov. 16, 1993); *see SOS Int'l, Ltd*., 2010 CPD ¶ 131, at \*1 n.1. Instead, the Comptroller General has concluded that a procuring agency must employ one of two methods for evaluating proposed prices for an IDIQ contract. *See id*.; *High-Point Schaer*, 70 Comp. Gen. 524, 529 (1991). Specifically, according to GAO decisions, a procuring agency must either (1) require offerors to provide prices for sample task orders, *High-Point Schaer*, 70 Comp. Gen. at 529, or (2) calculate "extended prices" by multiplying offerors' proposed unit prices by estimated quantities, *West Coast Copy*, 93-2 CPD ¶ 283, at \*5.

This court, however, respectfully concludes that the Comptroller General's approaches amount to "various levels of fiction." Ralph C. Nash & John Cibinic, *Evaluating Cost to the Government Where Quantities Are Unknown: A Puzzlement*, 14 No. 2 Nash & Cibinic Report ¶ 10 (Feb. 2000). After all, uncertainty about the government's eventual needs is precisely what drives a procuring agency's decision to select the IDIQ contract vehicle. *See* Vernon J. Edwards & Ralph C. Nash, *Taming the Task Order Contract: Congress Tries Again*, 22 No. 5 Nash & Cibinic Report ¶ 31 (May 2008). In such a circumstance, the use of estimated quantities does not provide a superior method for selecting the proposal that will ultimately prove to be least costly to the government. *See* Nash & Cibinic, *supra*. Moreover, at the solicitation stage, the crucial decision confronting the procurement official turns on the relative prices of competing proposals, not the absolute cost that the government will pay for the procured goods or services.[39]

Accordingly, the court concludes that it was lawful for the Army to rely upon the sum of unit prices, rather than the sum of extended prices, as the basis for awarding the AAA contract, a

---

[38] Plaintiff's reference to the court's decision in *Magnum Opus v. United States*, __ Fed. Cl. __, 2010 WL 2255523, at \*22 (May 28, 2010), is misplaced. *See* Pl.'s Mot. for Prelim. Inj. at 7. *Magnum Opus* does not address this issue, but rather stands for the unremarkable proposition that a procuring agency must evaluate competing proposals based upon a binding price, i.e., a proposed price that offerors will be contractually bound to honor. 2010 WL 2255523, at \*22.

[39] This is not to say that consideration of absolute cost is unimportant; after all, any procuring agency must operate within budgetary constraints. Here, the Army's budget for the AAA contract was $189 million for the maximum performance period of two years. AR 600, 716. Among the seven offerors with technically acceptable (Go-rated) proposals, the highest Total Amount for all CLINs—i.e., the estimated total cost of the contract—was $[number redacted] million, well within the Army's budget. *See* AR 618.

firm-fixed price IDIQ contract. This method for evaluating proposals was a reasonable exercise of the Army's discretion in this matter, permitted meaningful consideration of price given the uncertainties surrounding the Army's anticipated needs, and was otherwise in accordance with the broad statutory and regulatory guidance on this point.

### E. Plaintiff's Allegation of Unlawful Discussions Between the Army and Intervenor

Turning from the Army's price evaluation, plaintiff alleges, under Count 3, that the Army engaged in exclusive "discussions" with intervenor and no other offeror, through which discussions intervenor made a material and favorable revision to its proposal. Am. Compl. ¶¶ 83–88; Pl.'s Mot. for J. at 42–46; Pl.'s Resp. at 18–20. Plaintiff argues that the Army thus violated FAR 15.306, *see id.*, as well as "the fundamental tenet of Federal procurement law that 'Government business shall be conducted . . . with complete impartiality and with preferential treatment for none,'" Am. Compl. ¶ 84 (quoting FAR 3.101-1). As explained below, the court finds no merit in these allegations.

In negotiated procurements, the procuring agency may engage in a wide range of exchanges with offerors in order to facilitate the evaluation process and to permit the agency to make an informed award decision. *See* FAR 15.306; *ITAC*, 316 F.3d at 1320–23. FAR 15.306 defines several types of exchanges that a procuring agency may have with offerors. Different exchanges are permitted under different circumstances and at various stages of the procurement process. *See* FAR 15.306. In a competitive acquisition, these exchanges may include "discussions," which the FAR defines as "exchanges . . . undertaken with the intent of allowing the offeror to revise its proposal." FAR 15.306(d). Discussions are highly involved exchanges that "may include . . . persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract." *Id.* When discussions are held, they must be conducted equally with all offerors within the competitive range. FAR 15.306(d)(1).

Alternatively, "[a]ward may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions." FAR 15.306(a)(3). When award without discussions is contemplated, the procuring agency may nonetheless engage offerors in more limited exchanges called "clarifications." FAR 15.306(a); *see ITAC*, 316 F.3d at 1315. Clarifications are intended to give offerors "the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." FAR 15.306(a)(2). In contrast to discussions, which must be conducted uniformly with all offerors under consideration, a procuring agency "has the discretion to decline to enter into clarifications with an offeror, even if the agency has engaged in clarifications with another offeror." *DynCorp Int'l LLC*, 76 Fed. Cl. at 540; *see ITAC*, 316 F.3d at 1318 (noting that clarifications may be held "with one or more offerors").

As noted above, the RFP provided that the "Government intends to make award *without* discussions or negotiations." AR 47 (emphasis added); *see* AR 53 ("It is the Government's intent to award one (1) Firm Fixed-Price IDIQ contract without discussions."). Having clearly stated its intent in the RFP, the Army could lawfully proceed to award the AAA contract without discussions. *See* FAR 15.306(a)(3). Accordingly, the central issue under Count 3 is whether the

Army's exclusive exchange with intervenor constituted a "clarification" or "discussion" within the meaning of FAR 15.306.

The court begins by recognizing that the 1997 amendments to the FAR were intended to broaden significantly the definition of "clarifications" in FAR 15.306, in order to promote full and open exchanges between the government and prospective contractors. *See ITAC*, 316 F.3d at 1321–22 (*comparing* FAR 15.601 (1991) *with* FAR 15.306(a)(2) (2002)). And certainly, "[a]ny meaningful clarification would require the provision of information," which may include information "essential for evaluation of the [offeror's] proposal." *ITAC*, 316 F.3d at 1323. Thus, even if an exchange "provides information essential to evaluation criteria, increases a past performance score or tips the scales toward the offeror," that exchange may still constitute a mere clarification. *DynCorp Int'l LLC*, 76 Fed. Cl. at 542 (citing *ITAC*, 316 F.3d at 1323).

Here, the exchanges that plaintiff challenges took the form of limited email correspondence between the Army and intervenor. AR 580–81, 584. The contract specialist for the Solicitation initiated the email correspondence on December 29, 2009. AR 580–81. The contract specialist's email inquired of intervenor whether it planned on "working with" GLS in performing the AAA contract and, "if so," whether GLS would "be performing 25% of the effort." *Id*. Intervenor responded in the negative. AR 581, 584. Specifically, intervenor stated that it did "not intend to subcontract any portion of the work" to GLS, AR 581, and did "not intend to use any of the GLS subcontractors," AR 584.

Plaintiff first argues that this representation from intervenor was at odds with "the overwhelming evidence" in intervenor's proposal. Pl.'s Mot. for J. at 45; *see* Pl.'s Resp. at 18–19. Plaintiff further argues that, by crediting intervenor's representations, *see* AR 597, 609, the Army permitted intervenor to make a material and favorable revision to its proposal. Pl.'s Mot. for J. at 45. In particular, plaintiff contends that intervenor was "able to *persuade* and *alter the assumptions* of the Government" concerning the role of GLS in performance of the AAA contract should intervenor be selected for award. *Id*. (emphasis added); *see* Pl.'s Resp. at 18–19. Although plaintiff's argument is artfully framed—echoing, as it does, the references to "persuasion" and "alteration of assumptions" in FAR 15.306(d)(1)—the frame is empty.

Quite simply, plaintiff has pointed to nothing in intervenor's proposal indicating an intent to subcontract any of the work under the AAA contract to GLS or to use any of GLS' subcontractors. *See* Pl.'s Mot. for J. at 42–46; Pl.'s Resp. at 18–20. Indeed, GLS is conspicuously absent from the list of subcontractors that appears repeatedly in intervenor's proposal. *See* AR 429, 444, 446. In short, intervenor's email correspondence with the Army "simply confirmed that [intervenor] was not using GLS or GLS' subcontractors for the present effort." Intervenor's Resp. at 17.

Moreover, defendant offers an eminently reasonable explanation, one fully supported by the administrative record, of the impetus for the Army's inquiry. *See* Def.'s Mot. for J. at 17–18. The SSA had concerns about the GLS PPQ, AR 556–61, and other negative past performance information for GLS; these concerns are documented in the Source Selection Decision Document, AR 596–97, 609. Given these concerns, the Army sought to ascertain definitively—i.e., to clarify—the extent of GLS' potential involvement in performing the AAA contract, so that the SSA might determine the relevance of the GLS PPQ to the evaluation of intervenor's past

performance. *See* Def.'s Mot. for J. at 17–18; AR 596–97, 609.[40] Once reassured that intervenor did "not intend to use the joint venture of GLS nor its subcontractors," the SSA determined that the negative "ratings for GLS should not reflect unfavorably on [intervenor's] level of performance risk." AR 597.

Indeed, the precise exchange that took place between the Army and intervenor—an exchange in which an offeror was allowed to clarify the relevance of certain past performance information—is one that the FAR identifies as exemplary of a "clarification." *See* FAR 15.306(a)(2) (providing that "offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond)"). In accord is the Office of Federal Procurement Policy's ("OFPP") guidance to agencies. Office of Fed. Procurement Policy et al., *Best Practices for Collecting and Using Current and Past Performance Information*, ch. 3 (2000) ("*OFPP Best Practices*").[41] OFPP notes that agencies should "allow[] offerors to . . . clarify relevance of past performance information even when discussions are not anticipated"—precisely what the Army did here—adding that "[t]his type of exchange is a clarification," following which the "Government may still award without discussion." *Id.* (citing FAR 15.306(a)).

Incongruously with its assertion that intervenor's email response was at odds with "the overwhelming evidence" in intervenor's proposal, Pl.'s Mot. for J. at 45, plaintiff next argues that intervenor was "careful, in writing" that it did not intend to "subcontract" to GLS or to GLS' subcontractors, Pl.'s Resp. at 19–20. Plaintiff argues that this did not fully answer the Army's "precise question" as to whether intervenor planned on "working with" GLS. *Id.* (citing AR 581). "Yet," plaintiff continues, "the Government came away . . . with the impression that '[intervenor] does not intend to use GLS in support of this effort.'" *Id.* (quoting the SSDD at AR 597). Plaintiff seems to argue that intervenor responded to a narrower inquiry than the contract specialist intended or the SSA understood. The court, however, is unpersuaded.

The contract specialist's precise question to intervenor was this: "I need to know if you are planning on *working with* Global Linguist Solutions (which I understand is a joint venture between McNeil and [Offeror A]) on this requirement for AA. *If so*, will they be performing 25% of the effort for this requirement?" AR 581 (emphasis added). In light of the specifications in the RFP, these two questions together reveal the contract specialist's inquiry to be more targeted than plaintiff argues. Pertinently, the RFP stated: "If the offeror intends to subcontract any major services which exceed[] twenty-five percent (25%) of the value of this procurement, the offeror shall identify the proposed subcontractor(s) and provide past performance information on the subcontractor(s) . . . ." AR 49. In light of this requirement, the natural reading of the contract specialist's inquiry—whether intervenor would be "working with" GLS to an extent greater than 25%—is that she was asking whether intervenor intended to enter into a subcontracting arrangement with GLS. Intervenor answered this question squarely. *See* AR 580, 584.

---

[40] As the court discusses in greater detail when addressing Count 4, *infra*, this critically important relevance determination, in the course of the past performance evaluation, is committed to the SSA's broad discretion.

[41] *Available at* http://www.whitehouse.gov/omb/best_practice_re_past_perf#chap3.

And the SSA's documented understanding of intervenor's response was in accord. Specifically, the SSA stated: "When [intervenor] was contacted, they informed the Government that, if selected, they do not intend to use this subcontractor, nor any other GLS subcontractors." AR 597, 609.  Plaintiff makes much of the SSA's separate statement that "[i]n addition, [intervenor] does not intend to use the joint venture of GLS in support of this effort."  AR 597, 609.  There is no indication that the SSA based this broader statement upon information gleaned from the Army's exchange with intervenor rather than her own assessment of intervenor's proposal.  More to the point, to the extent that the SSA inferred what intervenor did not imply, that is of no moment.

After all, as plaintiff repeatedly notes, the "acid test for deciding whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal." *E.g.*, Pl.'s Resp. at 19–20 (quoting *DynCorp Int'l LLC*, 76 Fed. Cl. at 541); Pl.'s Mot. for Prelim. Inj. at 14 (same).  Based on the foregoing, it is clear that intervenor provided no new information through its email exchanges with the Army.  Therefore, it cannot be said that these exchanges permitted intervenor to revise its proposal.  Rather, intervenor simply made explicit what was implicit in its proposal, specifically, that GLS would not be among its subcontractors for the AAA contract.  *Compare* AR 581, 584 (email exchange) *with* AR 429, 444, 446 (list of proposed subcontractors in intervenor's proposal).

Finally, the Army's own view that its exchange with intervenor amounted to a clarification, rather than a discussion, is entitled to deference from the court.  *See ITAC*, 316 F.3d at 1323 (citing *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 218–19 (2001)); *Am. Express Co. v. United States*, 262 F.3d 1376, 1382 (Fed. Cir. 2001).  To be sure, this exchange proved essential to the Army's evaluation of intervenor's proposal, increased intervenor's past performance score, and tipped the scale in intervenor's favor.  None of this, however, suffices to eject the Army's email correspondence with intervenor from the lawful realm of clarifications.  *See DynCorp Int'l LLC*, 76 Fed. Cl. at 542 (citing *ITAC*, 316 F.3d at 1323).

### F. Plaintiff's Challenge to the Past Performance Evaluation

Tirelessly pressing on, plaintiff next targets the SSA's past performance evaluation.  Am. Compl. ¶¶ 90–119; Pl.'s Mot. for J. at 7–33; Pl.'s Resp. at 1–10.  Under Count 4, plaintiff essentially launches two challenges.  First, plaintiff alleges that the past performance evaluation was overly restrictive in scope and that the SSA unlawfully excluded from consideration a wide range of publicly available and purportedly relevant past performance information.  Am. Compl. ¶¶ 100–19.  Second, plaintiff challenges the SSA's decision to exclude the GLS PPQ from consideration when evaluating intervenor's past performance.  Am. Compl. ¶¶ 93–99.  As the court explains below, both challenges lack merit.

Past performance (i.e., offerors' record of performance under previously awarded contracts) is ordinarily[16] a mandatory evaluation factor in negotiated procurements for contracts exceeding $100,000 in value.  *See* FAR 2.101; FAR 15.304(c)(3)(i); FAR 42.1501.  An offeror's

---

[16] "Past performance need not be evaluated if the contracting officer documents the reason past performance is not an appropriate evaluation factor for the acquisition."  FAR 15.304(c)(3)(iii).

relevant past performance is considered predictive of that offeror's ability to perform successfully under the solicited contract. *See* FAR 15.305(a)(2)(i). Where "information on past performance is not available" for a given offeror, "the offeror may not be evaluated favorably or unfavorably on past performance." FAR 15.305(a)(2)(iv). Otherwise, in evaluating an offeror's record of past performance, the SSA must consider the "currency and relevance" of the available past performance information, the source and context of that information, as well as any general trends therein. FAR 15.305(a)(2)(i). The FAR further provides that the SSA "should take into account past performance information regarding . . . subcontractors that will perform major or critical aspects of the requirement when such information is relevant" to performance of the subject contract. FAR 15.305(a)(2)(iii).

Significantly, the FAR does not constrain the precise method that a procuring agency may adopt for evaluating offerors' past performance, so long as the agency describes the selected method in the solicitation. *See* FAR 15.305(a)(2)(ii) (providing that "[t]he solicitation shall describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history"). Further, the FAR entrusts the critical determination of "what does or does not constitute 'relevant' past performance to the SSA's considered discretion." *PlanetSpace*, 92 Fed. Cl. at 539 (citing FAR 15.305(a)(2)(ii)); *see Commissioning Solutions Global, LLC*, B-401553, 2009 CPD ¶ 210, at *3 (Comp. Gen. Oct. 6, 2009) (noting that "the contracting agency has the discretion to determine the relevance and scope of the performance history to be considered"). And the FAR provides merely that the SSA "should," rather than must, "take into account past performance information regarding . . . subcontractors." FAR 15.305(a)(2)(iii).

Concordantly, OFPP's guidance to procuring agencies recognizes that "various methods [] may be used to evaluate a competitive offeror with no past performance history," and that "it is at the *discretion of the agency* to determine the most appropriate method on a case-by-case basis." *OFPP Best Practices*, ch. 3 (emphasis added). In short, procurement regulations entrust the SSA with broad discretion in determining what information is relevant for consideration in the course of evaluating offerors' past performance.

Thus, when evaluating an offeror's past performance, the SSA "may give unequal weight," or no weight at all, "to different contracts when [the SSA] views one as more relevant than another." *SDS Int'l, Inc. v United States*, 48 Fed. Cl. 759, 769 (2001). All of this only augments the "especially great discretion" with which the SSA is generally entrusted in a negotiated procurement, discretion that extends even to the application of pertinent regulations. *Am. Tel. & Tel.*, 307 F.3d at 1379. This court previously noted the "triple whammy of deference" to which a procuring agency is entitled when a disappointed offeror challenges the past performance evaluation in a negotiated procurement. *Overstreet Elec. Co.*, 59 Fed. Cl. at 117.

**1. The SSA Lawfully Determined the Scope of the Past Performance Evaluation**

As noted above, a procuring agency has broad discretion in selecting a method for evaluating offerors' past performance, so long as the solicitation describes the chosen method. FAR 15.305(a)(2)(ii). In this case, the court concludes that the Army complied with the FAR's mandate by describing with great specificity its intended method for evaluating past performance. AR 54–55.

To begin, the RFP explained to offerors that "recent and relevant past performance information" would be evaluated as "an assessment of the probability that the offeror will complete the instant requirement successfully and in accordance with the contract terms." AR 54. To that end, completed PPQs were to be the primary basis for the SSA's past performance evaluation. AR 54–55. The SSA was to assign each offeror a past performance "risk rating" that correlated to the quantitative scores in the completed PPQs. *Id*. Underscoring the central role that PPQs would play in the past performance evaluation, the RFP warned offerors that the Army "is not required to contact and/or interview all [r]eference POCs identified by offerors," and that it "is the responsibility of each offeror to ensure [r]eference POCs submit completed past performance information." AR 55. In addition to completed PPQs, the RFP stated that the SSA "*may* use information obtained from other sources, including but not limited to Government sources." *Id*. (emphasis added). These were the RFP's directions concerning the evaluation of offerors' past performance.

The SSA followed these directions. For each offeror, the SSA assessed the currency and relevance of each contract for which a PPQ was submitted. *See* AR 602–12. With the notable exceptions of plaintiff and intervenor, the Army received, and the SSA included in the past performance evaluation, three completed PPQs for each offeror. *See* AR 594–99. The Army did not receive any PPQs for plaintiff, however; so, there were none for the SSA to evaluate. AR 607. As for intervenor, the SSA relied upon only two of the three completed PPQs, *see* AR 607–09, a determination that the court addresses separately below. Finally, the SSA exercised the discretion to consider "information obtained from other sources," AR 55, by conducting a Google search and a PPIRS search, looking for any negative publicity or negative past performance information. AR 594; *see* AR 602–12. As to any offeror for which either search yielded results, the SSA documented those results and weighed their relevance to the past performance rating for that offeror. *See* AR 594–96. Based upon the completed PPQs, as well as the results of the Google and PPIRS searches, the SSA assigned each offeror an "overall past performance risk rating." AR 599.

Plaintiff faults the SSA for relying only upon the completed PPQs, along with results of the Google and PPIRS searches, as the exclusive basis for her evaluation of offerors' past performance. *E.g.*, Pl.'s Mot. for J. at 24–32. Plaintiff argues that this restriction on the scope of the evaluated past performance information was arbitrary and at odds with the RFP's specifications. *Id*. Plaintiff's support for this allegation, however, amounts to little more than conclusory rhetoric. For example, plaintiff avers that "having relied exclusively upon returned PPQs, a fruitless Google search and cherry picked PPIRS search, the Government completely *omitted* the portion of the evaluation of . . . [p]roposals that was to assess their relative qualities based solely on the factors and subfactors specified in the Solicitation." Pl.'s Mot. for J. at 25 (emphasis added). Yet the SSA "omitted" nothing, but rather evaluated each offeror's past performance methodically and documented that evaluation in great detail. *See* AR 602–12. In strict adherence to the RFP's direction, the SSA based that evaluation primarily on the completed PPQs that the Army received. *See id*.

Plaintiff next charges that the SSA "literally never crack[ed] open" the section of offerors' proposals that described their past performance history. Pl.'s Mot. for J. at 27. This charge, however, is directly contradicted by the record. The SSA began the past performance evaluation by stating that "the Government reviewed the past performance proposals, and completed a

performance risk assessment." AR 594. The SSA explained that this included a review of "the contract references submitted to determine their relevance to the current requirement, as well as whether or not the information was recent." *Id.* Only "[a]fter the recent and relevant determination was made," based upon the information in offerors' proposals, did the SSA turn her attention to the completed PPQs. *Id.*

Focusing on its own proposal, plaintiff insists that it was irrational, and at odds with the terms of the Solicitation, for the SSA to assign plaintiff a risk rating of "Unknown Risk." Pl.'s Mot. for J. at 28. Plaintiff points to "accolades minimally in the form of three letter excerpts" in its proposal. Pl.'s Mot. for J. at 30–31 (quoting AR 280). Plaintiff also cites its own self-serving statement that these "accolades are a small sampling of the 'positive daily feedback we receive.'" *Id.* The court is not persuaded that any of this constituted information upon which the SSA could "base a meaningful performance risk prediction," AR 55. And without such meaningful information, the Solicitation required the SSA to assign plaintiff a risk rating of "Unknown Risk." *Id.*

Indeed, the court finds reasonable, if not laudable, the Army's choice to evaluate offerors' past performance based primarily upon the objective and disinterested ratings provided in the PPQs. This certainly permitted a more reliable "assessment of the probability that the offeror will complete the instant requirement successfully," AR 54, than did the self-interested and selective descriptions of past performance proffered in offerors' proposals. In particular, it was reasonable—and in accordance with the RFP's focus on completed PPQs as the basis for the past performance evaluation—for the SSA to assign no weight to the conclusory and self-interested narrative in plaintiff's proposal.

Still persisting, plaintiff argues that recent and relevant past performance information was available to the SSA in the form of plaintiff's ongoing performance under its bridge contract with the Army. Pl.'s Mot. for J. at 28. Plaintiff contends that the "Army ha[d] an obligation . . . as opposed to discretion" to consider this information, information that plaintiff contends was "personally known to the evaluators" and otherwise "too close at hand to ignore." Pl.'s Mot. for J. at 31. Yet nothing could be farther from what the law required of the Army and the SSA in this instance. Plaintiff ignores the RFP's express direction that an offeror's past performance was to be evaluated based upon the completed PPQs for each of three recent and relevant contracts. *See* AR 54. The Army received no PPQ for plaintiff's bridge contract, a fact that plaintiff does not dispute. Indeed, the Army received no PPQs for any of plaintiff's previous contracts, a fact that plaintiff knew even while the Army's evaluation of proposals was ongoing. *See* AR 322–26. Moreover, the RFP expressly proscribed the kind of evaluation that plaintiff invites, stating that evaluators "shall not consider or use as a basis for evaluation any assumptions, preconceived ideas, and personal knowledge or opinions not supported by material provided in the proposal." AR 53.

Finally, plaintiff lodges the baseless charge that the SSA did not perform a PPIRS search for plaintiff. Pl.'s Mot. for J. at 32. Oblivious to its own stance, plaintiff states that "other than the [SSA's] bald assertion, there is no evidence in the record which proves that the PPIRS search for Linc was actually performed." *Id.* Of course, it is well established that procurement officials are entitled to a strong presumption of regularity and good faith. *Am-Pro Protective Army, Inc. v. United States*, 281 F.3d 1234, 1239–41 (Fed. Cir. 2002); *Aero Corp. v. United States*, 38 Fed. Cl.

408, 413 (1997). Accordingly, the SSA's signed Source Selection Decision Document, stating that she performed a PPIRS search for plaintiff, is all that this court needs. And it is plaintiff who needs "clear and convincing evidence" to overcome the presumption, thereby supporting its assertion to the contrary. *See Am-Pro Protective Army*, 281 F.3d at 1239–40.

In short, it was reasonable, and in full compliance with the RFP's specifications as well as the mandate of FAR 15.305, for the SSA to limit the past performance evaluation to the completed PPQs and the results of the Google and PPIRS searches. And the SSA amply documented her methodical and impartial implementation of this evaluation.

## 2. The SSA Lawfully Exercised Her Discretion in Excluding the GLS PPQ from Consideration

The target of plaintiff's second attack on the past performance evaluation is the SSA's decision to exclude the GLS PPQ from consideration. Pl.'s Mot. for J. at 8–24. The court concludes that this decision too was lawful and represented a rational exercise of the SSA's vested discretion in this matter.

After considering the "source" of certain negative ratings in the GLS PPQ and the "context" of that data, *see* FAR 15.305(a)(2)(i), the SSA concluded that the negative "ratings received for GLS should not reflect unfavorably on [intervenor's] level of performance risk," AR 597. The SSA reached this conclusion based upon two determinations. First, the SSA noted that the source of GLS' unfavorable ratings was GLS' excessive subcontractor costs and poor management of those subcontractors. AR 597. Relatedly, the SSA recognized that the AAA contract was to be awarded on a firm-fixed price basis, such that price would "not [be] subject to any adjustment on the basis of the contractor's cost experience in performing the contract." *Id*. (quoting FAR 16.202-1). Second, the SSA recognized that intervenor did not intend to rely upon GLS or any GLS subcontractor for performance of the AAA contract. *Id*. As noted in the discussion of Count 3, *supra*, this conclusion was based upon intervenor's representations during its clarifying exchange with the Army and was fully consistent with intervenor's submitted proposal.

As to the relevance of cost management for performance of the AAA contract, plaintiff is correct that the AAA contract was to include a cost-reimbursement component. *See* Pl.'s Mot. for J. at 13. However, the value of this component (for travel and other direct costs) represented a small portion of the expected contract value. *See* AR 106, 156. Thus, as defendant points out, the Army was to be largely shielded from any cost overruns under the AAA contract.[42] *See* Def.'s Mot. for J. at 19.

As to the question of intervenor's use of GLS, plaintiff insists that intervenor "intend[ed] to invoke the resources of GLS in performing th[e AAA] contract." Pl.'s Mot. for J. at 12. Plaintiff contends that "[intervenor] and GLS are undoubtedly affiliated" companies, that "[intervenor] controls GLS," and that intervenor thus "should not be excused of GLS' negative"

---

[42] Plaintiff's estimate that the cost-reimbursement component amounted to $33 million, or roughly 15% of the value of the AAA contract, is based upon a fictional calculation. *See* Pl.'s Mot. for J. at 13 (citing AR 156, 716).

past performance information.  Pl.'s Mot. for J. at 9.  Plaintiff misses the mark, however, by focusing on the concepts of control and affiliation.[43]  For, neither the degree of affiliation between intervenor and GLS, nor the degree of control that intervenor may exercise over GLS, has any bearing upon the narrow determination at issue in the SSA's past performance evaluation.[44]

Given its insistence that intervenor should not "be excused" for GLS' negative past performance information, Pl.'s Mot. for J. at 8–9, it seems that plaintiff views the Army's contract award to intervenor as some form of pardon or exculpation for the latter's past wrongs.  Yet this is not crime and punishment.  In seeking to select the offeror that could provide the Army with the best value while fulfilling the Army's urgent and vital needs, the SSA had a focused and practical concern.

The SSA's concern was whether GLS' negative past performance was a meaningful predictor of intervenor's "level of performance risk," i.e., intervenor's ability to perform the requirements of the AAA contract successfully.  AR 597.  This was the RFP's stated purpose for the past performance evaluation, namely, "as a predictor of future contract performance."  AR 54.  The RFP also stated that the Army "may"—not must—"consider recent and relevant past performance information regarding [an offeror's] . . . other corporate entities or subcontractors."  AR 55.  This, of course, echoed the permissive language of FAR 15.305(a)(2), language that the FAR council has previously declined to restrict.  *See* FAR Part 15 Rewrite, 62 Fed. Reg. 51224, 51226 (Sept. 30, 1997).  The SSA thus exercised the discretion expressly entrusted to her by the FAR and the RFP to discount the past performance of GLS, one of intervenor's "other corporate entities," AR 55.  Moreover, this exercise of discretion was reasonable, given that GLS would not be involved in performing any portion of the AAA contract.  *See* AR 580–81, 584.

Plaintiff is adamant that intervenor nonetheless intends to "invoke the resources of GLS in performing this contract."  Pl.'s Mot. for J. at 12.  For example, plaintiff points to personnel recruitment centers and a database of pre-screened personnel candidates that plaintiff contends are being shared by intervenor and GLS.  *Id.* at 18–19 (citing AR 343–44, 460, 463).  Plaintiff's brief includes nearly three full pages of quotations from intervenor's proposal, purportedly demonstrating that intervenor intends to use GLS resources in performing the AAA contract.  *See* Pl.'s Mot. for J. at 21–23.  Yet intervenor's use of resources that were previously used by, or are currently shared with, GLS does not contradict the SSA's conclusion that GLS itself will not perform any portion of the AAA contract.  *See* AR 597.

---

[43] Certainly, none of the parties disputes that intervenor has a 50-precent ownership stake in GLS, its joint venture with Offeror A.  *See, e.g.*, Pl.'s Mot. for J at 8; Intervenor's Mot. for J. at 20; AR 444, 596.  Nonetheless, it is also undisputed that the limited liability company of GLS is a separate corporate and legal entity.  *See id*.

[44] Accordingly, the court need not accept plaintiff's invitation to construe the laws of Delaware, or to determine whether intervenor exercises "control" over GLS within the meaning of Delaware's Limited Liability Company Act.  *See* Pl.'s Mot. for J. at 8.  Nor does the court need to decide whether GLS and intervenor are "affiliates" within the meaning of the Small Business Size Regulations or the debarment and suspension regulations of the FAR, all of which are inapposite regulations.  *See* Pl.'s Mot. for J. at 9–10 (citing 13 C.F.R. §§ 121.103–.104; FAR 9.403; FAR 9.407).

In its zeal, plaintiff overlooks this distinction and insists that intervenor "explicitly identifies GLS when describing the 'McNeil Team.'" Pl.'s Mot. for J. at 8 (citing AR 444–45). This assertion is patently false. The cited section of intervenor's proposal begins by providing an exhaustive list of five companies that constitute the "McNeil team," none of which is GLS. AR 444. Then, in a separate paragraph, the proposal discusses the joint venture of GLS as an entity distinct from the "McNeil Team" and cites the "capability and knowledge-base" that the "McNeil Team"—not GLS—will be able "to replicate and transfer" to the AAA contract. AR 445.

Moreover, plaintiff has failed to demonstrate any nexus between GLS' previous difficulties (under the contract rated in the GLS PPQ) and those GLS resources that intervenor *may* call upon in performing the AAA contract. As the court previously explained, in determining whether the past performance record of an affiliated corporate entity "may" be attributed to an offeror, the court must examine whether the "affiliate will have meaningful involvement in contract performance." *Femme Comp, Inc. v. United States*, 83 Fed. Cl. 704, 746 (2008). Plaintiff has failed to identify, and the court cannot find, any evidence in the record that points to any planned "meaningful involvement" by GLS in performance of the AAA contract. *See id*. Even if such meaningful involvement by GLS could be demonstrated, the holding of *Femme Comp* does not speak to the SSA's decision to *decline* to attribute GLS' past performance to intervenor. Rather, *Femme Comp* stands for the much more limited proposition that evidence of an affiliate's meaningful involvement permits, rather than requires, attribution of the affiliate's past performance to the offeror.[45]  *Id*.

Finally, as intervenor points out, even if the SSA had included the GLS PPQ in evaluating intervenor's past performance, intervenor's risk rating would have changed from "Very Low Risk" to "Low Risk." *See* Intervenor's Mot. for J. at 21–22; *Calnet, Inc.*, 2010 CPD ¶ 130, at *2. This would have done nothing to alter plaintiff's risk rating of "Unknown Risk" or plaintiff's seventh-place ranking in past performance. *See* AR 600.

### G. Plaintiff's Remaining Allegations

Having failed on the merits of its allegations under Counts 1–4, plaintiff cannot alter its position as the seventh-ranked offeror in both price and past performance. *See* AR 599–600, 618. Accordingly, the court need not address plaintiff's remaining allegations, under Counts 5 and 6, that the SSA failed to conduct a proper trade-off analysis and that the technical evaluation of intervenor's proposal was flawed. *See* Am. Compl. ¶¶ 120–38.

For, even if it were to prevail on the merits of these allegations, plaintiff could not possibly demonstrate APA prejudice as would be necessary to entitle it to an award of bid preparation costs. *See* 28 U.S.C. § 1491(b)(2). In particular, if intervenor were assigned a technical rating of "No-Go," there would remain six offerors with a "Go" technical rating and with lower prices and more favorable past performance ratings than plaintiff. *See* AR 599–600, 618. Even under that counterfactual scenario, the Army would not have been required to include plaintiff in any trade-off analysis, proper or otherwise, and plaintiff would have had no chance of being awarded the

---

[45] The above reasons for upholding the SSA's exclusion of the GLS PPQ from consideration apply with equal force to the SSA's past performance evaluation for Offeror A, the other corporate owner of GLS. *See* AR 606–07.

AAA contract. Therefore, it is unnecessary for the court to address the merits of plaintiff's allegations under Counts 5 or 6.

## IV. CONCLUSION

For the foregoing reasons: (1) defendant's motion for judgment on the administrative record is **GRANTED**; (2) intervenor's motion for judgment on the administrative record is **GRANTED**; and (3) plaintiff's motion for judgment on the administrative record and for a permanent injunction is **DENIED**.  All Counts in plaintiff's amended complaint are **DISMISSED** with prejudice.  The Clerk is directed to take the necessary steps to dismiss this matter.

**IT IS SO ORDERED.**

s /*Lawrence J. Block*

Lawrence J. Block
Judge

**APPENDIX A**

As an initial matter, redaction is appropriate only for "information that must be protected in order to safeguard the competitive process, including source selection information, proprietary information, and confidential information." Prot. Order ¶ 1. Beyond this, the court must assess the propriety of any proposed redaction against the background "presumption of public access to judicial records." *Baystate Techs., Inc. v. Bowers*, 283 Fed. Appx. 808, 810 (Fed. Cir. 2008) (citing *Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 9 (1st Cir. 1998)); *see Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978) (assuming that the "common-law right of [public] access" applied to the tape recordings in that case).

To be sure, the right of public access to court records is not absolute. *Nixon*, 435 U.S. at 589. First and foremost, this right extends to information upon which the court relies in determining the parties' substantive rights. *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 408 (1st Cir. 1987). Otherwise, "[i]mportant countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." *Siedle*, 147 F.3d at 10. Accordingly, the Federal Circuit has held that, in determining whether information in court documents may be withheld from the public, "the court must balance the privacy interests of the parties against the public interest in access to the . . . information." *Bowers*, 283 Fed. Appx. at 810 (remanding to the trial court for the requisite balancing); *see Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 314 n.1 (2009) (citing the *Bowers* balancing requirement before deciding to accept "some, but not all, of defendant's proposed redactions"); *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 131–32 (2010) (conducting the requisite balancing before deciding to "reject[] most, though not all, of defendant's proposed redactions").

In light of this necessary balancing, the court finds that the parties' proposed redactions are overly broad. Much of the proposed redaction is aimed at qualitative assessments of offerors' proposals, such as the adjectival rating assigned to an offeror's past performance or an offeror's ordinal ranking under one or another evaluation factor. Such information, however, has no bearing on the competitive process, and the court has rejected the redaction of similar information from prior published opinions. *See, e.g.*, *Akal Sec.*, 87 Fed. Cl. at 314 n.1. Many of plaintiff's proposed redactions, in particular, seem targeted at withholding any information that reflects unfavorably on plaintiff's proposal. The purpose of redaction, however, is to safeguard the competitive process, not to withhold information that a party frowns on making public.

Finally, some proposed redactions are unnecessary because they target information that is already in the public domain. For example, references to Global Linguist Solutions' poor cost management under a prior military contract merely duplicate information that appears in published government documents. *See, e.g.*, Statement of John Isgrigg to the Commission on Wartime Contracting for Iraq and Afghanistan, at 4–5, 8–9 (August 12, 2009), *available at* http://www.wartimecontracting.gov/images/download/documents/hearings/20090812/Mr_John_Is grigg_INSCOM_Statement_08-12-09.pdf.

To be sure, certain details disclosed in the court's sealed opinion—including most instances of absolute (dollar value) prices—do constitute competition-sensitive information, the disclosure of which may permit an offeror's competitors to gain unfair advantage in future competitions. To such an important private interest, the presumption in favor of public access

must yield.  *See Siedle*, 147 F.3d at 10.  The parties also proposed redacting the names of all offerors other than plaintiff and intervenor, as well as the name of one of the offerors' subcontractors.  Given that this information is wholly incidental to the court's determination on the merits, the names of all offerors—other than plaintiff, intervenor, and two offerors the names of which are already publicly known—are replaced herein with the generic labels, "Offeror A," "Offeror B," etc.  All other redactions are indicated by the bracketed notations, [number redacted] or [name redacted].

## APPENDIX B

| CLIN | Supply/Service | "Estimated" Quantity of Personnel *these numbers are not definitive contract requirements; they are provided as estimates ONLY for evaluation purposes! | Number of Estimated Work Days in Each Period (For Evaluation Purposes Only) | Unit | Base Period Unit Price **Per Day Per Position | Option Period 1 Unit Price **Per Day Per Position | Option Period 2 Unit Price **Per Day Per Position | Option Period 3 Unit Price **Per Day Per Position | Total Amount (This amount will be the addition of all Unit Prices Proposed multiplied by Columns C and D) |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | In Country Program Manager, IAW para 5.1 | 1 | 180 | Day | | | | | 0 |
| 0002 | Senior Advisor, IAW para 5.2 | 12 | 180 | Day | | | | | 0 |
| 0003 | Special Advisor, IAW para 5.3 | 84 | 180 | Day | | | | | 0 |
| 0004 | Strategic Team Director, IAW para 5.4 | 1 | 180 | Day | | | | | 0 |
| 0005 | Military Analyst, IAW para 5.5 | 32 | 180 | Day | | | | | 0 |
| 0006 | Iraqi Advisor, IAW para 5.6 | 110 | 180 | Day | | | | | 0 |
| 0007 | Information Operations Targeting Officer, 5.7 | 1 | 180 | Day | | | | | 0 |
| 0008 | Mobilization/DeMob costs (COST REIMBURSABLE, NO FEE) | Not evaluated | | | | | | | 0 |
| 0009 | ODCs (O&A insurance, Travel expenses, misc equipment)- COST REIMBURSABLE, NO FEE | Not evaluated | | | | | | | 0 |
| 0010 | Local National Advisors (LNA) | 500 | 180 | Day | | | | | 0 |
| 0011 | Contractor Manpower Reporting (CMR) | | | | | | | | 0 |
| | TOTAL EVALUATED PRICE: (This number will be calculated by adding up the UNIT prices for ALL CLINS and ALL Base and Option Periods) | | | | | | | | |

**Unit prices entered shall be DAILY RATES (24 hrs of coverage) PER position

**A DAY is equal to 24 hours of coverage, 7 days a week